No. 23-15036

---

## United States Court of Appeals
## for the Ninth Circuit

_____

MANUEL DE JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated, et al.,

*Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA,

*Plaintiff-Intervenor-Appellee*,

v.

PAUL PENZONE, in his official capacity as Sheriff of Maricopa County, Arizona,

*Defendant/Appellant*.

_____

On Appeal from the United States District Court for the
District of Arizona, Phoenix Cause No. 2:07-cv-02513-GMS

---

## OPENING BRIEF

---

Eric M. Fraser
Brandon T. Delgado
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
efraser@omlaw.com
bdelgado@omlaw.com

**Attorneys for Defendant/Appellant
Paul Penzone**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................5

INTRODUCTION ....................................................................................8

JURISDICTION........................................................................................9

ISSUES PRESENTED..............................................................................9

STATEMENT OF FACTS AND CASE ................................................10

I.     The lawsuit...................................................................................10

II.    The First Order. ..........................................................................13

III.   The Second Order. ......................................................................17

IV.    The Third Order and the "Monitor's independent authority to make
       the ultimate decision." ...............................................................20

SUMMARY OF ARGUMENT ...............................................................29

STANDARD OF REVIEW ....................................................................30

ARGUMENT ..........................................................................................30

I.     The Third Order violates Article III of the U.S. Constitution by
       giving a nonjudicial officer ultimate decision-making authority. ................30

       A.     Article III of the U.S. Constitution limits the judicial power
              of ultimate decision-making authority to judges appointed by
              the President and confirmed by the Senate. .......................................30

              1.     Because Article III of the U.S. Constitution limits the
                     judicial power to duly appointed judges, a court-
                     appointed nonjudicial officer is limited to making
                     recommendations and acting in an advisory capacity. ............31

              2.     Even if a court properly delegates an advisory role to a
                     nonjudicial officer, the court must explicitly provide a
                     mechanism for de novo judicial review..................................36

B.      Here, the Monitor is a nonjudicial officer and accordingly the district court could give him only limited authority. ..........................38

C.      The district court abused its discretion by giving the Monitor authority make decisions beyond an advisory capacity, without express court review...............................................................39

     1.      The district court abused its discretion by giving the monitor authority to make the ultimate decision. .....................39

     2.      The district court independently abused its discretion by not providing an unequivocal mechanism for de novo judicial review of the Monitor's decisions. .....................43

II.     The Third Order violates Federal Rule of Civil Procedure 53 by giving the Monitor ultimate decision-making authority................................44

A.      Federal Rule of Civil Procedure 53 limits a special master's authority to an advisory capacity to make orders and recommendations subject to court approval........................................44

     1.      Federal Rule of Civil Procedure 53 limits a special master to making advisory orders and recommendations. ........................................................................44

     2.      Federal Rule of Civil Procedure 53 requires de novo judicial review of a special master's recommendations and proposed orders. .................................................................47

B.      The district court could not give the Monitor powers beyond those authorized by Rule 53. ..............................................................48

C.      The district court abused its discretion by giving the Monitor authority to make the final decision, which is not subject to any district court review. ....................................................................51

     1.      The district court abused its discretion by giving the Monitor final decision-making authority..................................51

     2.      The district court also abused its discretion by eliminating judicial review of the Monitor's decisions. ...........53

III.   The Third Order violates Federal Rule of Civil Procedure 65 by not
       stating the terms of the injunction specifically................................................54

       A.     Federal Rule of Civil Procedure 65 prohibits injunctions that
              vest a nonjudicial officer with discretion to determine the
              terms of the injunction...........................................................................54

       B.     The district court abused its discretion by giving the Monitor
              the authority to determine the terms of the injunction........................56

CONCLUSION...................................................................................................58

STATEMENT OF RELATED CASES ...................................................................59

CERTIFICATE OF COMPLIANCE......................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
  284 F.3d 1091 (9th Cir. 2002) ...........................................................35

*Armstrong v. Brown*,
  768 F.3d 975 (9th Cir. 2014) ......................................................*passim*

*Bateman v. U.S. Postal Serv.*,
  231 F.3d 1220 (9th Cir. 2000) ..........................................................30

*City of New York v. Mickalis Pawn Shop, LLC*,
  645 F.3d 114 (2d Cir. 2011) ...........................................34, 54, 55, 57

*Cobell v. Norton*,
  334 F.3d 1128 (D.C. Cir. 2003)...................................................45, 52

*Corning Inc. v. PicVue Elecs., Ltd.*,
  365 F.3d 156 (2d Cir. 2004) (per curiam) ...................................54, 57

*Hoptowit v. Ray*,
  682 F.2d 1237 (9th Cir. 1982) ......................................35, 42, 46, 48

*Kimberly v. Arms*,
  129 U.S. 512 (1889).........................................................................32

*Maricopa Cnty. v. Arizona*,
  616 P.2d 37 (Ariz. 1980) .................................................................42

*Meeropol v. Meese*,
  790 F.2d 942 (D.C. Cir. 1986).........................................................37

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) (*Melendres I*) ....................................10

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) (*Melendres II*)............................10, 30

*Melendres v. Maricopa County*,
815 F.3d 645 (9th Cir. 2016) (*Melendres III*)......................................................10

*Melendres v. Maricopa County*,
897 F.3d 1217 (9th Cir. 2018) (*Melendres IV*)...................................................10

*Montijo v. Swaney*,
754 F. App'x 522 (9th Cir. 2018) ........................................................................35

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982).........................................................................................31, 33

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*,
828 F.2d 536 (9th Cir. 1987) ......................................................................*passim*

*Ruiz v. Estelle*,
679 F.2d 1115 (5th Cir. 1982) ....................................................................*passim*

*Ruiz v. Estelle*,
688 F.2d 266 (5th Cir. 1982) ..............................................................................31

*Sandin v. Conner*,
515 U.S. 472 (1995).......................................................................................33, 35

*Schmidt v. Lessard*,
414 U.S. 473 (1974)..............................................................................................54

*SEC v. Elliot*,
953 F.2d 1560 (11th Cir. 1992) ...........................................................................34

*Stone v. City & Cnty. of S.F.*,
968 F.2d 850 (9th Cir. 1992) .................................................................15, 35, 49

*Thompson v. Enomoto*,
815 F.2d 1323 (9th Cir. 1987) ......................................................................15, 49

*Toussaint v. McCarthy*,
801 F.2d 1080 (9th Cir. 1986) ....................................................................*passim*

*United States v. Arizona*,
641 F.3d 339 (9th Cir. 2011) ..............................................................................11

*United States v. Microsoft*,
   147 F.3d 935 (D.C. Cir. 1998)....................................................................*passim*

*Wellness Int'l Network Ltd. v. Sharif*,
   575 U.S. 665 (2015)...........................................................................................31

**Constitutional Provisions**

Ariz. Const. art. 12, § 3 .......................................................................................42

U.S. Const. art. II ..............................................................................................30

U.S. Const. art. III ..........................................................................................*passim*

**Statutes & Rules**

28 U.S.C. § 1291 ...................................................................................................9

28 U.S.C. § 1331 ...................................................................................................9

Fed. R. Civ. P. 53 ...........................................................................................*passim*

Fed. R. Civ. P. 65 ...........................................................................................*passim*

**Other Authorities**

16A Am. Jur. 2d *Constitutional Law* § 310........................................................33, 45

66 Am. Jur. 2d *References* § 2 ..........................................................................32, 45

11 Wright & Miller, *Federal Practice and Procedure* § 2955................................54

## INTRODUCTION

This appeal is about whether a district court may give to a court-appointed monitor the power to make decisions on behalf of an independently elected government official.

This long-running case stems from past conduct of racially profiling Latino drivers and passengers under the guise of enforcing immigration laws by the Maricopa County Sheriff's Office (MCSO) while led by former Sheriff Joseph Arpaio.

This Court has already heard several appeals from this case. This appeal involves the district court's injunction giving a court-appointed Monitor the "independent authority to make the ultimate decision" on behalf of MCSO and requiring MCSO to implement the Monitor's decisions and policies.

These aspects of the injunction must be reversed for three separate reasons. First, they violate Article III of the U.S. Constitution by improperly delegating judicial power to a nonjudicial officer. Second, they violate Federal Rule of Civil Procedure 53, which allows a court-appointed agent to make recommendations but not the ultimate decision binding on the parties. Third, they violate Federal Rule of Civil Procedure 65, which requires that an injunction state its terms specifically and which prohibits allowing someone other than an Article III judge to specify precisely what a party must do. The Court should reverse.

**JURISDICTION**

This is a federal question action involving claims under the U.S. Constitution. ECF-26. The district court had jurisdiction under 28 U.S.C. § 1331. On November 8, 2022, the district court entered a third supplemental permanent injunction and judgment order (ECF-2827), and then issued an amended order on November 30, 2022. 1-ER-2. On January 9, 2023, Sheriff Paul Penzone timely appealed those orders. 3-ER-308. This Court has jurisdiction under 28 U.S.C. § 1291.

**ISSUES PRESENTED**

1. Under Article III of the U.S. Constitution, a nonjudicial officer such as a monitor may act in an advisory capacity only and his actions must be subject to district court review. Did the district court exceed its authority and abuse its discretion when it gave the Monitor authority to make decisions and policies for MCSO, which are also not subject to district court review?

2. Under Fed. R. Civ. P 53, a special master may make recommendations, which must be subject to district court review. Did the district court exceed its authority and abuse its discretion when it gave the Monitor the authority to order MCSO to take certain actions and make certain decisions, which are not subject to district court review?

3. Fed. R. Civ. P. 65 requires the district court to state the terms of an injunction specifically and not leave the terms of an injunction to be determined by

a nonjudicial officer. Did the district court exceed its authority and abuse its discretion when it issued an injunction that did not state its terms specifically but, rather, gave the Monitor the discretion to determine the injunctive relief itself?

## STATEMENT OF FACTS AND CASE

This Court has previously detailed the underlying facts of this case in several prior opinions. *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (*Melendres I*); *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) (*Melendres II*); *Melendres v. Maricopa County*, 815 F.3d 645 (9th Cir. 2016) (*Melendres III*); *Melendres v. Maricopa County*, 897 F.3d 1217 (9th Cir. 2018) (*Melendres IV*). Sheriff Penzone recounts only the facts necessary to resolve this appeal.

## I. The lawsuit.

In 2007, the plaintiffs filed a class action alleging that former Maricopa County Sheriff Joseph Arpaio and the MCSO, under the guise of enforcing immigration laws, racially profiled Latino drivers and passengers. ECF-26 (amended complaint) at 3. Specifically, the plaintiffs alleged that under Sheriff Arpaio's direction and control, MCSO officers "targeted Latino persons for investigation of immigration status, using pretextual and unfounded stops, racially motivated questioning, and often baseless arrests." *Id.* at 3. Consequently, the plaintiffs sought declaratory and injunctive relief to enforce their rights under the Fourth and Fourteenth Amendments to the United States Constitution. *Id.*

In December 2011, after discovery, the district court addressed the parties' motions for summary judgment. ECF-494 at 1 (order on summary judgment and class certification). The district court first concluded that the plaintiffs had "standing to seek injunctive relief on their Search and Seizure claims because MCSO had publicly stated that it may stop persons based solely on a belief that they are not legally present in the country, and on their Equal Protection claims because they have brought forth evidence suggesting that MCSO engages in a policy or practice of racial profiling." *Id.* at 32, 38–39. The district court concurrently certified the plaintiffs' class as to "All Latino persons who, since January 2007, have been or will be in the future, stopped, detained, questioned or searched by MCSO agents while driving or sitting in a vehicle on a public roadway or parking area in Maricopa County, Arizona." *Id.* at 37.

In the same order, the district court granted summary judgment in favor of the plaintiffs on part of their Fourth Amendment claims. *Id.* at 38. The district court granted summary judgment on the Fourth Amendment claims "to the extent that they claim MCSO's stated position that it has the authority to detain persons based on reasonable suspicion, without more, that they are not legally present in the country will cause them future harm." *Id.* In granting partial summary judgment, the district court reasoned that "states do not have inherent authority to enforce the civil provisions of federal immigration law." *Id.* at 37 (quoting *United States v. Arizona*,

641 F.3d 339, 362 (9th Cir. 2011)). For the relief, the district court ordered "partial injunctive relief enjoining [MCSO] from detaining any person based solely on knowledge, without more, that the person is in the country without lawful authority." ECF-494 at 37. Finding genuine issues of material fact on the remaining claims, the district allowed the plaintiffs to proceed with their Fourteenth Amendment and other Fourth Amendment claims. *Id.* at 38–40.

After a bench trial, the district court entered its Findings of Fact and Conclusions of Law in May 2013. ECF-579. It ultimately found that MCSO violated the plaintiffs' rights under the Fourth and Fourteenth Amendments when MCSO used "race as a factor in arriving at reasonable suspicion or forming probable cause to stop or investigate persons of Latino ancestry for being in the country without authorization." *Id.* at 4. As part of the relief, the district court permanently enjoined MCSO from:

1. Detaining, holding or arresting Latino occupants of vehicles in Maricopa County based on a reasonable belief, without more, that such persons are in the country without authorization.

2. Following or enforcing its LEAR policy against any Latino occupant of a vehicle in Maricopa County.[1]

3. Using race or Latino ancestry as a factor in determining to stop any vehicle in Maricopa County with a Latino occupant.

---

[1] The district court found that MCSO's LEAR policy "require[d] a deputy (1) to detain persons she or he believes only to be in the country without authorization, (2) contact MCSO supervisors, and then (3) to await contact with ICE pending a determination how to proceed . . ." ECF-579 at 4.

4. Using race or Latino ancestry as a factor in making law enforcement decisions with respect to whether any Latino occupant of a vehicle in Maricopa County may be in the country without authorization.

5. Detaining Latino occupants of vehicles stopped for traffic violations for a period longer than reasonably necessary to resolve the traffic violation in the absence of reasonable suspicion that any of them have committed or are committing a violation of federal or state criminal law.

6. Detaining, holding or arresting Latino occupants of a vehicle in Maricopa County for violations of the Arizona Human Smuggling Act without a reasonable basis for believing that, under all the circumstances, the necessary elements of the crime are present.

7. Detaining, arresting or holding persons based on a reasonable suspicion that they are conspiring with their employer to violate the Arizona Employer Sanctions Act.

*Id.* at 141–42.

## II.  The First Order.

The district court held a status conference with the parties in June 2013 to discuss the detailed terms of an injunctive order that would ensure MCSO's compliance with the seven injunctive paragraphs above.  3-ER-296 (Tr. 6/14/2013). During the status conference, the district court discussed the appointment and duties of a court-appointed monitor.  3-ER-299–303.  The district court stated that it's not "a question of whether or not an independent monitor will be appointed. . . . The question is the scope of that monitor's authority . . ."  3-ER-300.  For example, the district court discussed overhauling MCSO's training materials, stating "I'm not even sure I'm going to allow an independent monitor to sign off on them.  I may have to sign off on them myself."  3-ER-302.

13

At the status conference, MCSO opposed the appointment of a monitor. 3-ER-306. With respect to the monitor's authority, MCSO made it clear that its position was that the district court must "be the ultimate arbiter of what is approved and not approved." *Id.* Ultimately, the parties decided that they would prefer to confer and come to an agreement on a consent decree, including on the monitor's authority. 3-ER-307. Therefore, the district court ordered the parties to file a memorandum and lodge a consent decree after they conferred. ECF-582.

The parties were able to come to an agreement on some terms but were unable to agree on the provisions related to a monitor. ECF-592 at 9–10. Accordingly, the parties filed supplemental briefs in August 2013 addressing the contested provisions, including those related to the monitor. 2-ER-277–80 (defendants' supplemental brief); 2-ER-265–67 (plaintiffs' supplemental brief).

In its supplemental briefing, MCSO opposed "the appointment of a so-called 'Independent Monitor.'" 2-ER-277. MCSO again objected to the monitor being the ultimate and final decision-maker and argued that the court's order must provide a judicial review mechanism of the monitor's recommendations:

> While the Court, as an Article III judge, unquestionably has the authority to Order an elected sheriff in Arizona to take certain actions to comply with the federal constitution or forbid a sheriff from taking certain actions that violate the federal constitution and not concurrently violate the Arizona Constitution and law, Defendants submit *the same is not true of an "independent" monitor.*
>
> . . . .

14

Defendants acknowledge that an "Independent Monitor," if one were to be ordered by the Court, can lawfully review, study, and observe MCSO operations and then advise and recommend to the Sheriff what he should or should not do. *But, ultimately, it is the Sheriff's decision whether to follow the recommendations of the "Independent Monitor." Only this Court can require, direct, or order the Sheriff to do or not to do something.* For example, if an "Independent Monitor" believes the Sheriff must do subject "A" or refrain from doing activity "B" and the Sheriff disagrees, the Sheriff's decision carries the day unless otherwise ordered by the Court directly. However, if a monitor were to be appointed, *the Sheriff submits that provisions or terms relating to such a monitor would need to make explicit that when there is disagreement between a monitor's recommended action or inaction and the Sheriff's decision, it is the exclusive province of the Court to resolve the disputed matter: (a) without the monitor's recommendation or advice having any force or effect unless and until approved and ordered by the Court*; and (b) without the burden of proof or persuasion being shifted to the Sheriff in opposing the monitor's recommendation or advice.

2-ER-277–78 (emphases added).

In response, the plaintiffs requested that the district court appoint a "monitor," arguing that federal courts have repeatedly approved the use of special masters to monitor compliance with court orders. 2-ER-265 (plaintiff's supplemental brief). As justification, the plaintiffs cited cases where a special master was appointed to monitor compliance with an injunction. *Id.* (citing *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 859 n.18 (9th Cir. 1992) ("Federal courts repeatedly have approved the use of special masters to monitor compliance with court orders and consent decrees."); *Thompson v. Enomoto*, 815 F.2d 1323, 1327 (9th Cir. 1987) (noting the "district court appointed a special master to monitor compliance with the 1976

order")).  The plaintiffs also cited Federal Rule of Civil Procedure 53(b) ("Special Masters") in support.  2-ER-265.

In addition, the plaintiffs clarified to MCSO and the district court that their proposed order limited the monitor's duties to an advisory role only.  2-ER-266.  As explained by the plaintiffs, the monitor would make recommendations: "[u]nder Plaintiffs' proposal, the monitor would: *develop for the Court's approval* an initial plan for monitoring compliance . . . and *recommend to the Court* and the Parties any steps necessary to achieve compliance."  *Id.* (emphases added).  In fact, plaintiffs stated "[t]o be clear, Plaintiffs' proposal does not provide the monitor with the ability to unilaterally order the MCSO to take or to refrain from any action; '*the ultimate arbiter of compliance is the Court*.'"  *Id.* (emphasis added).

Relying on this briefing, the district court issued a Supplemental Permanent Injunction/Judgment Order (the First Order) in October 2013, which included the appointment of a "Monitor," among other remedial measures.  2-ER-188, ¶ dd.  In a series of provisions, the district court limited the Monitor's role to monitoring and assessing compliance, defining the Monitor as "a person or team of people who shall be selected to *assess and report* on the Defendants' implementation of this Order."  2-ER-188, ¶ dd; 2-ER-230–35, ¶¶ 126-39.  For example, the Monitor "shall file with the Court quarterly written, public reports" and "develop a plan for conducting . . . audits."  2-ER-232–33, ¶¶ 130, 133.  The Monitor must first try to

achieve consensus among the parties on the audit plan. 2-ER-233, ¶ 133. "In the event the Parties cannot agree, the plan will be submitted to the Court for final approval." *Id.*

The First Order also explicitly provides that the Monitor may make "recommendations to the Parties regarding measures necessary to ensure timely, Full and Effective Compliance with this Order and its underlying objectives," but the "ultimate arbiter" is the district court. 2-ER-231, ¶ 128; 2-ER-235, ¶ 139. It further provides that "[i]n any areas where the Parties are not able to resolve issues with the Monitor—including those areas where the Order provides for input from the Monitor—the Parties may submit their grievances directly to the Court for resolution." 2-ER-231, ¶ 128.

## III. The Second Order.

In early 2015, a couple of years into the implementation of the First Order, the plaintiffs sought to have the district court hold former Sheriff Arpaio and others in civil contempt. ECF-843 (plaintiffs' memorandum of law and facts re contempt proceedings and request for order to show cause). The plaintiffs alleged, in part, that former Sheriff Arpaio and MCSO "continued to detain persons solely based on unlawful presence in direct violation of the Court's order" and failed to turn over relevant items to the plaintiff's during discovery. ECF-843 at 4, 8.

After learning of these allegations, the United States sought to intervene in the case. ECF-1177 at 1. Under Section 902 of the Civil Rights Act of 1994, the United States asserted that it had "an unconditional right to intervene in cases of general public importance that allege Equal Protection violations." *Id.* It further alleged that former Sheriff Arpaio and MCSO's contempt "make clear that the United States' active participation in the remedial phase of this action as a plaintiff-intervenor is necessary to protect the United States' interest in effective and nationwide enforcement of civil rights laws . . ." *Id.* at 2. Finding that the United States did have an "absolute" right to intervene under the circumstances, the district court granted the motion. ECF-1239 at 1–3.

After holding 21 days of evidentiary hearings, the district court found former Sheriff Arpaio in civil contempt in May 2016. ECF-1677 at 1, 162. The district court found that MCSO and former Sheriff Arpaio "intentionally failed to implement the Court's preliminary injunction in this case, failed to disclose thousands of relevant items of requested discovery that they were legally obligated to disclose, and, after post-trial disclosure of additional evidence, deliberately violated court orders and thereby prevented a full recovery of relevant evidence in this case." *Id.* at 1–2.

To remedy this misconduct and non-compliance, the district court entered a Second Supplemental Permanent Injunction/Judgment Order (The Second Order) in

July 2016. 2-ER-109. In the Second Order, the district court again noted that before the bench trial and issuance of the First Order, former Sheriff Arpaio failed to disclose thousands of relevant items, "resulting in a trial that did not completely address—and remedies that did not fully repair—MCSO's violations of Plaintiffs' constitutional rights." 2-ER-110. In particular, the district found that in investigating deputy misconduct, former Sheriff Arpaio and MCSO "manipulated all aspects of the internal affairs process to minimize or entirely avoid imposing discipline on MCSO deputies and command staff whose actions violated the rights of the Plaintiffs' class." *Id.* The district court noted that had the court had access to this evidence, it would have entered a First Order "much broader in scope." 2-ER-111. Accordingly, the district court fashioned the Second Order to address MCSO's mishandling of internal investigations. 2-ER-115; 2-ER-125–75.

In the Second Order, the district court expanded the scope of the Monitor's oversight and assessment into various internal investigation processes. 2-ER-126–33. In addition to the expansion of the Monitor's advisory role into internal investigations, the Second Order required MCSO to "complete their internal investigations within 85 calendar days of the initiation of the investigation (60 days if within a Division)." 2-ER-137, ¶ 204.

The Second Order, however, continued to provide that the district court was final arbiter, consistent with the First Order. 2-ER-126, ¶¶ 164-65. Specifically, in

the Second Order, the district ordered that "[a]ll policies, procedures, protocols, training materials, and other material required by this Order are subject to the same process of review and comment by the parties and approval by the Monitor described in Section IV and ¶ 46 of the first Supplemental Permanent Injunction (Doc. 606)." 2-ER-126, ¶ 164. In relevant part, Section IV provides that "[i]f either party does not agree with the Monitor's determination, then the Party may make a motion directly to the Court for resolution of the dispute." 2-ER-193, ¶ 17. It further provides that "[a]ny policies, procedures, protocols or other materials subject to the dispute need not be implemented until the Court makes a determination." 2-ER-194, ¶ 17.

## IV. The Third Order and the "Monitor's independent authority to make the ultimate decision."

In November 2016, a few months after the district court issued the Second Order, the voters elected Appellant, Sheriff Paul Penzone, to be the Sheriff of Maricopa County. 2-ER-108. Around that time, MCSO's compliance with the First Order was just 60% for Phase 1 and 49% for Phase 2, and its compliance with the Second order was just 1% for Phase 1 and 43% for Phase 2. ECF-1943 at 6.

After Sheriff Penzone was elected, MCSO took numerous actions to substantially increase its compliance with the district court's injunctive orders. By February 2021, MCSO's compliance with the First Order increased to 98% for Phase 1 and 78% for Phase 2; for the Second Order it increased to 100% for Phase 1 and

91% for Phase 2. ECF-2594 at 5. Despite that substantial improvement under Sheriff Penzone's leadership, MCSO still was unable to complete internal investigations within the 85-day deadline prescribed by the district court. ECF-2616 at 6–13. In March 2021, the plaintiffs requested an order to show cause and for the court to initiate civil contempt proceedings against Sheriff Penzone for the first time in this case. ECF-2610 at 3.

The district court subsequently set the matter for an order to show cause hearing. ECF-2636. During the hearing, the district court recognized that former Sheriff Arpaio's actions "were the reason why [the district court] entered the [previous injunctive] orders." *Id.* at 15:8. At the same time, however, the district court stated that it would likely hold Sheriff Penzone in contempt for non-compliance with the timely processing of internal investigations, but that it would be open to any argument that the "sheriff shouldn't be held in contempt." *Id.* at 15:19–20. Accordingly, the district court recommended to Sheriff Penzone that it would be more efficient "to focus the hearing on what kind of remedy [the district court should] impose to bring the Sheriff's Office into compliance . . ." *Id.* at 15:22–24.

In the interest of judicial efficiency, Sheriff Penzone ultimately decided that he would not present any further evidence or argument contesting a finding of contempt considering the district court's stated intention to make such a finding. 2-

ECF-2663 at 2 (joint report). Therefore, the parties agreed that the contempt proceedings should focus on the issue of remedies. *Id.*

During the contempt proceedings, the district court's management expert recommended that the court appoint a Constitutional Policing Advisor. 2-ER-102–06. The district court's expert recognized that even though the current MCSO leadership has increased the quality of investigations, "one of the major concerns expressed by plaintiffs is the lack of trust in MCSO's investigative process as a result of the agency's legacy of abuse of its discretion . . ." 2-ER-102. Accordingly, the expert recommended a Constitutional Policing Advisor to "potentially increase external confidence in legitimacy . . ." 2-ER-100. Much like the Monitor, the expert envisioned that the Constitutional Policing Advisor would advise and make recommendations:

> An entity of this sort could certainly be helpful to the pending situation in Maricopa County, and its mission could be tailored to the specific circumstances of MCSO and the ongoing judicial supervision. Ideally, the CPA would also be provided with the responsibility to publicly *report* on what it is finding, and the degree to which MCSO is accepting of her/his *recommendations* for how each particular allegation is to be handled. And finally, the CPA should be afforded the ability to interact with the Community Advisory Board ("CAB") to explain its role, report on what it is finding, and hear any concerns that the CAB might have.
>
> . . . .
>
> [T]his writer does not agree that the CPA should have the ultimate authority to dictate classification decisions.

2-ER-105 & n.28 (emphases added).

In response to the expert report, Sheriff Penzone did "not oppose the general concept of an independent CPA that will work with the PSB Commander to make complaint intake decisions." 2-ER-89. However, Sheriff Penzone argued that the Constitutional Policing Advisor should be limited to providing "input" and "should not have the authority to dictate intake classification decisions." 2-ER-90. Sheriff Penzone also was open to the expert's suggestion that "as an alternative to the hiring of a new individual to serve in the role he describes for the CPA, the Monitoring team could fulfill the role . . ." *Id.*

The plaintiffs argued that the Constitutional Policing Advisor "should not be styled as a Constitutional Policing Advisor, but rather as a Constitutional Policing *Authority*, with the power to resolve disagreements with PSB over complaint intake and classification, or whether MCSO should open an investigation at all." 2-ER-68 (emphasis added). But at the same time, the plaintiffs argued that "[w]here Plaintiffs, the United States, and Defendants disagree with any decision made by the CPA, they will meet and confer and attempt to resolve disagreement in good faith. Where disagreements cannot be resolved, a party may raise the issue for resolution with the Court . . ." 2-ER-69.

After the parties' briefing, the district court held a status conference. 2-ER-49 (Tr. 8/23/2022). At the conference, the expert stated that he did not think that the first step should be to vest the Constitutional Policing Advisor with "final authority":

> [M]y hope would be that the collaborative work of that CPA, along in tandem with the Sheriff's Office, would provide a more effective way to handle complaints as they are received to ensure that they are handled appropriately, that the complainant gets a timely response, that the evidence is collected in a way so an appropriate evidence-based decision could be made on outcomes and that the discipline, if appropriate, was also appropriate.

> But I do think, at least as an initial step, that wouldn't require the CPA to be final authority, but, you know, depending on how it works out, Judge, that could be ultimately the way it works out, if in fact the Sheriff's Office isn't listening or ignoring the advice of the CPA.

2-ER-53–54. The district court responded to the expert, stating that "I take it from your observation that a central intake process needs to be created that one—that at least a formalized intake process does not now exist." 2-ER-54. The expert agreed. *Id.*

The district court then asked Sheriff Penzone whether the Monitor could serve as the Constitutional Policing Advisor. 2-ER-55. Sheriff Penzone did not object so long as the Monitor's role was "in line with otherwise how [the expert] has recommended he envisions that role," (e.g., to make recommendations and to not have final authority). 2-ER-56. The district court then asked the plaintiffs whether "the monitor would not be able to have independent authority?" *Id.* The plaintiffs were concerned that if the Monitor had independent authority "it could take away

24

from the role of their current duties under paragraph 126 of the first order," 2-ER-56–57, which generally provides that the Monitor may only review, report, and make recommendations:

> The Monitor shall be subject to the supervision and orders of the Court, consistent with this Order. The Monitor shall have the duties, responsibilities and authority conferred by the Court and this Order, including, but not limited to: (1) *reviewing* the MCSO Patrol Operations Policies and Procedures provided for by this Order and *making recommendations* to the Court regarding the same; (2) *reviewing* a protocol with the Parties to ensure that any Significant Operations conducted by the MCSO are conducted in a race-neutral fashion; (3) *reviewing* the curriculum, materials and proposed instructors for Training required by this Order; (4) *reviewing* the collected traffic stop data and the collected Saturation Patrol data to determine whether the data required to be gathered by this Order is, in fact, being collected by the MCSO; (5) *reviewing* protocols regarding the collection, analysis, and use of such data and determining whether the MCSO is in compliance with those protocols; (6) *reviewing* the collected data to determine whether, in the opinion of the Monitor, MCSO is appropriately reviewing the collected data to determine possible isolated or systemic racial profiling occurring, and if so, *reporting* the factual basis supporting that judgment to the Parties and the Court; (7) *evaluating* the effectiveness of the MCSO's changes in the areas of supervision and oversight and *reporting* the same to the parties and the Court; (8) *reviewing* the corrective action taken by the MCSO concerning any possible violations of this Order or MCSO policy and procedures and *reporting* the same to the parties and the Court; (9) *evaluating* the MCSO's engagement with the communities affected by its activities as set forth by this Order; and (10) *assessing* the MCSO's overall compliance with the Order.

2-ER-230–31, ¶ 126 (emphases added). The United States also objected to the Monitor being the one with the final authority:

> But we think that it would be preferable to have a different entity serve as the CPA for a couple of reasons. One is to preserve the monitor's

role in assessing compliance with the second order as provided in paragraph 126.

Given that the CPA could have an expansive role in getting technical assistance and having the ultimate say, as we have envisioned it, on classification decisions, it would be difficult for the monitor to be able to both play those roles, and essentially assess its own work in evaluating compliance with the order. So we think it would be clearer and more appropriate for those roles to be distinct.

As to—practical considerations also weigh in favor of having someone other than the monitor play this role. One is the changes do not have to wait for a CPA to be on board. I understand the advantages that the monitor is here now, but the Court could go forward, and MCSO could go forward with trying out and demonstrating the effectiveness of some of the proposed changes through a pilot program before a CPA is brought on board.

. . . .

So for all of those reasons, we do think that it would be better served to not have the CPA and the monitor playing the same role.

2-ER-61–62.

After the status conference, the district court issued a draft injunctive order in October 2022, which did not adopt any of the parties' specific proposals with respect to the Constitutional Policing Advisor. 2-ER-34. The draft order "expanded the Monitor's duties to include those of the Constitutional Policing Authority." 2-ER-42, n.3.

Several portions of the draft order would properly allow the Monitor to make recommendations, with the district court making the final determination:

The Monitor shall finalize and submit such policies to the Court within four months of the date of this order. The parties shall have two weeks

thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, if necessary thereafter, make determinations as to the final policies.

2-ER-44, ¶ 349.

As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor. The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. The Court will, thereafter, make determinations as to the final policies.

2-ER-45, ¶ 353.

Other paragraphs, however, would give the Monitor the power to make decisions and policies on behalf of MCSO. For example, draft Paragraph 346 gave the Monitor to make determinations concerning complaints:

In consultation with the PSB Commander, the Monitor shall make determinations and establish policy decisions regarding, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases.

2-ER-43, ¶ 346.

Similarly, in draft Paragraph 347, the district court gave the Monitor the power to revise and formalize MCSO's intake and routing processes:

The Monitor shall revise and/or formalize MCSO's intake and routing processes. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, to change such designations. The Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision with respect to intake and routing, and any other issues raised by the Monitor.

2-ER-43, ¶ 347.

Sheriff Penzone objected to the grant of authority in draft Paragraphs 346 and 347, arguing that the Monitor's decisions should be subject to the "procedures established pursuant to Paragraph[] 353 of the Order . . ." 2-ER-26–28 (Penzone's response to draft order). As stated above, draft Paragraph 353 provided that the parties may make proposals to the Monitor, who then makes a recommendation to the district court, which is then subject to party objection and district court approval. 2-ER-44–45. If the district court had adopted this objection, the Third Order would have properly given the Monitor the role of an advisor that made recommendations to the district court, while preserving the district court's authority to make the ultimate decision.

Ultimately, the district court went the other direction. In November 2022, the district court issued the Third Order. Instead of limiting the Monitor's authority, the district court instead gave the Monitor even more sweeping authority, adding (to both Paragraphs 346 and 347) that the Monitor "maintains *independent* authority to make the *ultimate* decision." 1-ER-9–10, ¶¶ 346, 347 (emphases added).

Consequently, although the First Order made the *district court* the "ultimate arbiter" (2-ER-231, ¶ 128), the Third Order gave the Monitor the authority "to make the ultimate decision" (1-ER-9–10, ¶¶ 346-347).

On January 9, 2023, Sheriff Penzone timely appealed from the district court's Third Order.  3-ER-308.

## SUMMARY OF ARGUMENT

Under Article III of the U.S. Constitution, a nonjudicial officer may act in an advisory capacity only and a nonjudicial officer's actions must be subject to judicial review.  By granting the Monitor authority to make complaint intake and routing decisions and policies for MCSO and without district court review, the district court violated this requirement and abused its discretion.  (Argument § I.)

Under Fed. R. Civ. P. 53, a special master may make recommendations, which must be subject to district court review.  Accordingly, the district court's injunction requiring MCSO to immediately implement the Monitor's decisions and policies, which are not subject to district court review, also violates Fed. R. Civ. P. 53 and is an abuse of discretion.  (Argument § II.)

Fed. R. Civ. P 65 requires that an injunction state its terms specifically and does not allow a nonjudicial officer to determine the terms of the injunction. By grating the Monitor authority to determine the injunctive relief itself, the district court violated Fed. R. Civ. P. 65 and abused its discretion.  (Argument § III.)

This Court should vacate Paragraphs 346, 347, and 350 of the Third Order.

## STANDARD OF REVIEW

"The scope and terms of the district court's injunction [] are reviewed for an abuse of discretion." *Melendres II*, 784 F.3d at 1260. "A district court abuses its discretion if it does not apply the correct law" or "it makes an error of law." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1223-24 (9th Cir. 2000).

## ARGUMENT

The Third Order violates three independent principles, each of which is sufficient to reverse. First, it violates Article III of the U.S. Constitution by improperly delegating judicial power to nonjudicial officers. Second, it violates Federal Rule of Civil Procedure 53, which allows court-appointed agents to make recommendations but not the ultimate decision binding on the parties. Third, it violates Federal Rule of Civil Procedure 65, which requires that an injunction state its terms specifically and which prohibits allowing someone other than an Article III judge to specify precisely what a party must do.

## I. The Third Order violates Article III of the U.S. Constitution by giving a nonjudicial officer ultimate decision-making authority.

### A. Article III of the U.S. Constitution limits the judicial power of ultimate decision-making authority to judges appointed by the President and confirmed by the Senate.

Article III of the U.S. Constitution vests the "judicial power of the United Sates" only in duly appointed judges. Article III judges must be appointed by the President and confirmed by the Senate. U.S. Const., art. II (the President "shall

30

nominate, and by and with the advice and consent of the Senate, shall appoint . . . judges of the Supreme Court, and all other officers of the United States"); *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 (1982) ("The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III"), *superseded by statute on other grounds as recognized in Wellness Int'l Network Ltd. v. Sharif*, 575 U.S. 665, 669 (2015).

> **1.  Because Article III of the U.S. Constitution limits the judicial power to duly appointed judges, a court-appointed nonjudicial officer is limited to making recommendations and acting in an advisory capacity.**

The judicial power of an Article III judge "to appoint an agent to supervise the implementation of its decrees has long been established." *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), *amended in part on rehearing*, 688 F.2d 266 (5th Cir. 1982). "Such court-appointed agents have been identified by a confusing plethora of titles: 'receiver,' 'Master,' 'Special Master,' 'master hearing officer,' 'monitor,' 'human rights committee,' 'Ombudsman,' and others." *Ruiz*, 679 F.2d at 1161 (citation omitted).

Consistent with the Constitution's mandate that the judicial power vests only in judges appointed by the President and confirmed by the Senate, the function of court-appointed agents "is clear, whatever the title"; they are not a "roving federal district court." *Id.* at 1161–62. Said another way, a court may not "abdicate its duty to determine by its own judgment the controversy presented, and devolve that duty

upon any of its officers." *Kimberly v. Arms*, 129 U.S. 512, 524 (1889); *see also* 66 Am. Jur. 2d *References* § 2 ("While a court may appoint a master to aid the judge in specific duties, a court cannot delegate or abdicate its judicial power . . . ."); *accord id.* at § 51 ("An order of appointment cannot delegate absolute judicial power to a referee.").

This Court has reversed the appointment of a nonjudicial officer when the officer was not "specifically limited . . . to making recommendations." *Armstrong v. Brown*, 768 F.3d 975, 987-88 (9th Cir. 2014). In *Armstrong*, after two decades of litigation and years of noncompliance, the district court delegated to a nonjudicial officer the power to "resolve disputes between Plaintiffs' counsel and the State over compliance." *Id.* at 978–79, 983, 986.

On appeal, the Court applied the long-standing principle that a court may not "abdicate its duty to determine by its own judgement the controversy presented." (quoting *Kimberly*, 429 U.S. at 524). The case implicated the rule that "[t]he ongoing, intractable nature of this litigation affords the district court considerable discretion in fashioning relief." *Id.* at 986. But the Court nevertheless reversed. It reasoned that it has only approved of appointments that limited a nonjudicial officer "to making recommendations." *Id.* 987. The Court further explained that other courts "have similarly approved the appointment of nonjudicial officers to act in advisory capacities only." *Id.* at 987 n.4 (collecting cases). For example, a court

appointed a receiver "whose legal and factual findings must be approved by the district court." *Id.* (citation omitted). Other courts have also applied the rule that a nonjudicial officer such as a special master is "always advisory." *United States v. Microsoft*, 147 F.3d 935, 955 (D.C. Cir. 1998); *see also* 16A Am. Jur. 2d *Constitutional Law* § 310 ("Federal courts are not prohibited from using nonjudicial officers to support judicial functions as long as the judicial officer retains and exercises ultimate responsibility.").

In other cases, courts have expressed the concern that a district court's delegation of non-advisory power to a monitor "raises serious constitutional questions." *Toussaint v. McCarthy*, 801 F.2d 1080, 1102 n.23 (9th Cir. 1986), *overruled in part on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995). In *Toussaint*, the monitor acted under the authority of the district court's order when it "ordered the release of a number of prisoners from administrative segregation." *Id.* at 1086.

On appeal, the Court "note[d] sua sponte that the district court's delegation to the Monitor of the power to order the release raises serious constitutional questions." *Id.* at 1102 n.23; *see also N. Pipeline Constr. Co.*, 458 U.S. at 59 ("The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III."). The Court explained that it had "found no case in which such a broad delegation of power to a special master has withstood review." *Id.* at

1102 n.23; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) ("Serious constitutional questions arise when a master is delegated broad power to determine the content of an injunction as well as effectively wield the court's power of contempt."). The Court did not ultimately resolve whether the arrangement violated the Constitution solely because the defendants did not raise the issue on appeal. But the Court emphasized that it did "not wish [its] silence to be taken as a ratification of the district court's order." *Toussaint*, 801 F.2d at 1102 n.23.

Again, appellate courts have repeatedly "approved the appointment of nonjudicial officers to act in advisory capacities only," but giving nonjudicial officers the power to make the ultimate decision violates the Constitution. *Armstrong*, 768 F.3d at 987 n.4. In *Armstrong*, the Court collected multiple cases to support this conclusion. As stated above, the Court cited another case where the "court-appointed receiver was an officer of the court whose legal and factual findings must be approved by the district court." *Armstrong*, 768 F.3d at 987 n.4 (citing *SEC v. Elliot*, 953 F.2d 1560, 1577 (11th Cir. 1992)). Similarly, the Court explained that in one case the special master was allowed to make "recommendations to the district court." *Armstrong*, 768 F.3d at 987 n.4 (citing *Ruiz*, 679 F.2d at 1159–63). The Court also found that in other cases it approved "the appointment of a technical advisor to assist the district court in monitoring

compliance" and "the appointment of a special master to investigate, report, and make recommendations to the city and the court." *Id.* at 987 (citing *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091, 1097 (9th Cir. 2002); *Stone v. City & Cnty. of S.F.*, 968 F.2d 850, 852, 863 (9th Cir.1992)).

This rule has particular force when a nonjudicial officer interferes with the operations of an independent governmental defendant. "Masters may not be placed in control of governmental defendants for the purpose of forcing them to comply with court orders." *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 545 (9th Cir. 1987); *Ruiz*, 679 F.2d at 1162 (affirming the district court's order that the specials master "is not to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance"). An order placing a nonjudicial officer in control of a governmental defendant would be an "error as an overreaching of judicial authority." *Hoptowit v. Ray*, 682 F.2d 1237, 1263 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995), *as recognized in Montijo v. Swaney*, 754 F. App'x 522, 524 (9th Cir. 2018).

This rule does not reduce the power of the judiciary. An Article III judge, who was appointed by the President and confirmed by the Senate, may use the court's injunctive power to compel independent government officials to act. But a court cannot constitutionally delegate this power to a nonjudicial officer.

### 2. Even if a court properly delegates an advisory role to a nonjudicial officer, the court must explicitly provide a mechanism for de novo judicial review.

Even if a court gives a nonjudicial officer the ability to make recommendations, courts reverse when the order provides no express mechanism for judicial review. In *Armstrong*, for example, the Court found that "[a]s currently drafted, the injunction does not provide any mechanism for review of the expert's decisions by the district court and so risks permitting the expert to 'displace the district court's judicial role.'" 768 F.3d at 988. Accordingly, the Court held that "[w]e therefore cannot affirm this part of the Modified Injunction." *Id.*

Therefore, an order appointing a nonjudicial officer must contain an "unequivocal commitment to non-deferential review." *Microsoft*, 147 F.3d at 954–55 (rejecting the United States' argument that the appointment of the special master "contains an implicit reservation by the district court of a power of *de novo* review" because it provides for "propose[d] findings"); *see also Ruiz*, 679 F.2d at 1163 (modifying district court order to include a provision that the special master's reports, findings, and conclusions "are not to be accorded any presumption of correctness and the 'clearly erroneous' rule will not apply to them").

Otherwise, the appointment of a nonjudicial officer without any explicit mechanism for judicial review would in effect be "the imposition on the parties of a surrogate judge and either a clear abuse of discretion or an exercise of wholly non-

existent discretion." *Microsoft*, 147 F.3d at 956; *see also Meeropol v. Meese*, 790 F.2d 942, 961 (D.C. Cir. 1986) (affirming the district court's denial of appointing a nonjudicial officer because it was "doubtful that judicial time or resources would be conserved to any significant degree" because the district court must engage in "careful review" of a special master's decisions or else "judicial authority is effectively delegated to an official who has not been appointed pursuant to article III of the Constitution").

The district court must make this judicial review explicit in the order. Appellate courts have squarely rejected the notion that an order can "contain[] an implicit reservation by the district court of a power of *de novo* review, and that that unstated reservation saves the order." *Microsoft*, 147 F.3d at 954 ("no such rescue mechanism is available"); *see also Armstrong*, 768 F.3d at 988 ("While the district court might have intended the expert's decision to be subject to review or appeal, that intention is not reflected in the order.").

\*     \*     \*

In sum, the Constitution vests the judicial power of the United States only in judges appointed by the President and confirmed by the Senate. Consistent with its judicial power, the district court may appoint a nonjudicial officer to act in an advisory capacity only. This means that that a district court may appoint a nonjudicial officer to make recommendations and reports to the court.

The district court may not, however, give a nonjudicial officer the power to decide what a party must or must not do. A nonjudicial officer cannot require a party to implement the nonjudicial officer's mandate, particularly as to an independent government official. In other words, a district court cannot delegate its authority to a nonjudicial officer. Even a defendant's repeated noncompliance with court orders cannot relax this constitutional requirement.

In addition, even if the district court properly appoints a nonjudicial officer to make recommendations, the district court's order must explicitly provide for judicial review.

### B. Here, the Monitor is a nonjudicial officer and accordingly the district court could give him only limited authority.

Under the First Order, the Monitor was "appointed by the Court." ECF-606 at 47. By a separate order, the district court appointed Robert Warshaw of Warshaw and Associates, Inc. to be the Monitor. 2-ER-181. As a non-Article III judge and a monitor appointed by the court, Mr. Warshaw is a nonjudicial officer.

The Monitor's status as a nonjudicial officer triggers the constitutional principles above. Consequently, the district court could give him the power to make recommendations to the court, but could not give him the power to tell MCSO what to do, or the authority to require MCSO to implement his recommendations.

**C.    The district court abused its discretion by giving the Monitor authority make decisions beyond an advisory capacity, without express court review.**

In some portions of the Third Order, the district court properly gave the Monitor the role of an advisor who would make recommendations, with explicit provisions for judicial review and decision.  For example, Paragraph 353 requires the Monitor to "present" information to the district court, and then the court will "make determinations as to final policies":

> MCSO and the parties shall complete and submit to the Monitor for approval all such proposed policies within three months of this order. As to those issues on which the parties cannot obtain consensus, they shall each submit their proposals to the Monitor.  The Monitor shall then, *promptly present to the Court the final proposed policies* he deems best.  The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. *The Court will, thereafter, make determinations* as to the final policies.

1-ER-13 (emphases added).  This provision contemplates the Monitor's ability to make recommendations and district court review, but this is limited to "such proposed policies" within that paragraph.  *Id.*  Accordingly, this paragraph and others like it do not improperly delegate judicial power to the Monitor.  *See Armstrong*, 768 F.3d at 987–88 & n.4 (nonjudicial officer may make recommendations subject to district court review).

**1.    The district court abused its discretion by giving the monitor authority to make the ultimate decision.**

The district court, however, improperly delegated its powers with respect to three other paragraphs.  Paragraphs 346 and, 347, and 350 provide that the Monitor

shall have the "independent authority to make the ultimate decision," which MCSO

must "expeditiously implement":

> In consultation with the PSB Commander, *the Monitor shall make determinations and establish policy decisions pertaining to backlog reduction regarding*, by way of example, which complaints should be (a) investigated by PSB; (b) sent to the Districts for investigation or other interventions; or (c) handled through other methods, to include diversion and/or outsourcing of cases. The Monitor must consult with the PSB Commander about these policy decisions but *maintains independent authority to make the ultimate decision*.

1-ER-10, ¶ 346.

> *The Monitor shall revise and/or formalize MCSO's intake and routing processes*. The Monitor's authorities shall include, but not be limited to, the power to audit and review decisions made with respect to individual cases and, if necessary, *to change such designations*. The Sheriff and the MCSO s*hall expeditiously implement the Monitor's directions or decision* with respect to intake and routing, and any other issues raised by the Monitor pertaining to backlog reduction and any other authority granted the Monitor under the Court's orders. The Monitor must consult with the PSB Commander about these processes but *maintains independent authority to make the ultimate decision*.

*Id.*, ¶ 347.

> The Monitor will assess MCSO's compliance with the investigative requirements of this order and *shall determine whether training on investigative planning and supervision is needed and implement such training.*

1-ER-11, ¶ 350.

(Emphases added.)

Paragraphs 346, 347, and 350 do precisely what a court cannot do. They

impermissibly delegate the court's Article III powers to a nonjudicial officer by

giving him the authority to direct the actions of MCSO and giving him the power to make the ultimate decision.

In *Armstrong*, the Court emphasized that it and other courts have approved of a nonjudicial officer making recommendations in an "advisory capacit[y] only." 768 F.3d at 987–88 & n.4 (collecting cases). Accordingly, the Court reversed an order giving a nonjudicial officer the power to resolve disputes between the parties. *Id.* at 988.

Here, the district court ran afoul of that principle by giving the Monitor the "independent authority to make the ultimate decision" on routing and intake designations, policies, and processes. 1-ER-10, ¶¶ 346, 347. For example, MCSO and the Monitor may have differing opinions on whether a complaint should be handled by the Professional Standards Board or a Division. But instead of making a recommendation, the Monitor has impermissible authority to make the ultimate decision. *Id.* Similarly, MCSO and the Monitor may disagree on whether a certain policy or training should be implemented to reduce the backlog of complaints, but again the Monitor has the authority to make the ultimate decision. 1-ER-10–11, ¶¶ 346, 347, 350.

The district court also violated the advisory principle limiting nonjudicial officers to recommendations by giving the Monitor the authority to "determine whether training on investigative planning and supervision is needed and implement

41

such training." 1-ER-11, ¶ 350. Here, too, the district court impermissibly gave a nonjudicial officer the power to make decisions on behalf of a party, and the authority to direct that party to implement the Monitor's chosen requirements.

Giving the Monitor this authority in this case also runs afoul of the principle that a court cannot delegate to a nonjudicial officer the power to "control of governmental defendants." *Mullen*, 828 F.2d at 545; *see also Toussaint*, 801 F.2d at 1102 n.23; *Hoptowit*, 682 F.2d at 1263; *Ruiz*, 679 F.2d at 1163 (affirming district court order that the special master is not to "direct the defendants or any of their subordinates to take or to refrain from taking any specific action"). Here, Paul Penzone is the independently elected Sheriff of Maricopa County (which is in turn a political subdivision of the State of Arizona). *See* Ariz. Const. art. 12, § 3 ("There are hereby created in and for each organized county of the state the following officers who shall be elected by the qualified electors thereof: a sheriff . . . ."); *Maricopa Cnty. v. Arizona*, 616 P.2d 37, 38 (Ariz. 1980) (Maricopa County is a political subdivision of the State of Arizona).

These provisions of the Third Order therefore violate Article III by giving the Monitor, rather than the court, the power to control and order MSCO to take certain actions. On this basis alone, this Court should vacate Paragraphs 346, 347, and 350.

> **2.** **The district court independently abused its discretion by not providing an unequivocal mechanism for de novo judicial review of the Monitor's decisions.**

The Third Order also independently violates the requirement that an order granting a nonjudicial officer authority must explicitly provide an unequivocal mechanism for de novo judicial review of a nonjudicial officer's recommendation, and such review cannot be implicit. *See Armstrong*, 768 F.3d at 988 (reversing district court order that did not reflect the district court's intention of district court review); *Microsoft*, 147 F.3d 935 (requiring an "unequivocal commitment" to de novo review and rejecting United States' implicit judicial review argument). The same three paragraphs (¶¶ 346, 347, 350) provide for no judicial review at all, let alone the required de novo review.

As explained above (Argument § I.A.2), the required judicial review cannot be implicit. Here, not only do these paragraphs contain no explicit review provision, but the district court implicitly rejected judicial review. In Sheriff Penzone's response to the draft Third Order, he requested that the district court apply the same judicial review procedures as Paragraph 353 provided. 2-ER-26–28 (Penzone's response to draft order). The district court did not do so, and in fact went the other direction by adding that the Monitor maintains "independent authority to make the ultimate decision."—which phrase was not in the initial draft, but instead was added

after the objections. *Compare* 2-ER-42–43, ¶¶ 346, 347 (draft third order), 347, *with* 1-ER-10, ¶¶ 346, 347 (third order).

The lack of judicial review warrants reversal. On any issue on which the district court seeks the Monitor's input, an Article III judge needs to make the ultimate decision. This is an independent issue. Providing for judicial review would not cure the problem with the scope of the Monitor's power. But the lack of judicial review makes things even worse and provides another basis for reversal.

## II. The Third Order violates Federal Rule of Civil Procedure 53 by giving the Monitor ultimate decision-making authority.

The Third Order also violates Rule 53, which limits the scope of a special master's authority. This is an independent basis for reversing.

### A. Federal Rule of Civil Procedure 53 limits a special master's authority to an advisory capacity to make orders and recommendations subject to court approval.

#### 1. Federal Rule of Civil Procedure 53 limits a special master to making advisory orders and recommendations.

A special master's authority is subject to limitations. Specifically, Fed. R. Civ. P. Rule 53(f) provides that a special master may issue an "order, report, or recommendation" subject to district court approval. "In acting on a master's orders, report, or recommendations, the court must give the parties notice and an opportunity to be heard . . ." Fed. R. Civ. P. 53(f). The district court "may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." *Id.*

Under Rule 53, a "special master [should] not be an 'advocate' for the plaintiffs or a 'roving federal district court.'" *Cobell v. Norton*, 334 F.3d 1128, 1143 (D.C. Cir. 2003) (quoting *Ruiz*, 679 F.2d at 1161) (reversing reappointment of court monitor).

A district court cannot appoint a special master with the power to make the ultimate decision, or with authority that goes beyond advising the court. "While a court may appoint a master to aid the judge in specific duties, a court cannot delegate or abdicate its judicial power, as the trial court must examine and consider the evidence for itself, and determine whether the law and facts justify the judgment recommended by the master." 66 Am. Jur. 2d *References* § 2; *accord* 16A Am. Jur. 2d *Constitutional Law* § 310 ("Federal courts are not prohibited from using nonjudicial officers to support judicial functions as long as the judicial officer retains and exercises ultimate responsibility.").

For example, the D.C. Circuit reversed the reappointment of a monitor when "[t]he Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself." *Cobell*, 334 F.3d at 1142. The court further explained that "[t]he Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system." *Id.* The case "goes far beyond the practice that has grown up around Rule 53." *Id.*; s*ee also Microsoft*, 147 F.3d 935 (noting that a special

master's findings must "always [be] advisory" and a district court may violate Article III and Rule 53 at the same time).

Similarly, courts affirm appointments of special masters that do not place the special master in "control of governmental defendants." *Mullen*, 828 F.2d at 539, 545 (noting district court appointed a special master, known as the "Monitor," under Rule 53 and that the district court gave the Monitor the power "only to observe" the governmental defendants). Thus, a special master may not direct a governmental defendant to take action. *Id.* (affirming order that "[t]he Monitor shall not purport to direct any CAMP activities or agents, or issue orders"); *see also Ruiz*, 679 F.2d at 1162 (approving part of district court order that the special master "is not to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance," and "[i]f any party objects, the special master is to hold a hearing, then make his report to the district court."). But a special master may monitor compliance with a court's order. *See Hoptowit*, 682 F.2d at 1263 (approving Rule 53 appointment of special master that "empower[ed] the master only to monitor compliance with the court's orders").

Consistent with the approval of cases where a nonjudicial officer may act in an advisory capacity, this Court has disapproved of a district court order that gave the special master the authority to order a governmental defendant to take action. In *Toussaint*, the district court "appointed a special master, known as the Monitor,"

under Rule 53. 801 F.2d at 1085–86. Acting under the district court's order, the Monitor "ordered the release of a number of prisoners from administrative segregation." *Id.* at 1086. Although the Court did not decide the issue because the defendants did not raise the issue on appeal, the Court emphasized that it "found no case in which such a broad delegation of power to a special master has withstood review" and is did not wish its "silence to be taken as a ratification of the district court's order." *Id.* at 1102 n.23. Although the Court cited constitutional concerns, such a delegation of power would also violate Federal Rule of Civil Procedure 53's requirement that the special master may only make recommendations and orders subject to district court approval.

### 2. Federal Rule of Civil Procedure 53 requires de novo judicial review of a special master's recommendations and proposed orders.

As with the prior issue (Argument § I.A.2), even if a court properly limits a special master to an advisory capacity, courts also require an explicit and "unequivocal commitment to non-deferential review." *Microsoft*, at 956 (finding that because there was no mechanism for judicial review the appointment of the special master "was in effect the imposition on the parties of a surrogate judge and either a clear abuse of discretion or an exercise wholly non-existent discretion").

Regardless of whether a court implicitly intends for judicial review, the district court must provide a judicial review mechanism in its order. *See Armstrong*,

768 F.3d at 988 (reversing order that did not have judicial review mechanism); *Hoptowit*, 682 F.2d at 1263 (affirming a district court's order that provided the Rule 53 master's decision would "not be implemented pending [the district court's] review").

\* \* \*

In sum, Rule 53 limits a special master to making recommendations and proposed orders in an advisory capacity only. A district court cannot give a special master the authority to make the ultimate decision, or to order a party (particularly a governmental entity) to take specific action. In addition, a district court must provide an unequivocal mechanism for de novo judicial review of a special master's recommendation or proposed order.

### B. The district court could not give the Monitor powers beyond those authorized by Rule 53.

The limitations of Rule 53 apply here. As a threshold matter, even though the district court used the label "monitor" instead of "special master," Rule 53 applies for several reasons.

First, courts use the terms "monitor" and "special master" interchangeably, and routinely appoint a "monitor" under Rule 53. *See e.g.*, *Toussaint*, 801 F.2d at 1085 ("The court appointed a special master, known as the Monitor"); *Mullen*, 828 F.2d at 545 ("Special Master (hereafter 'Monitor')").

Second, when requesting the Monitor, the plaintiffs did not distinguish between special masters and monitors, instead grouping them together. *See* 2-ER-265 ("special masters and monitors"). As authority for appointing the Monitor, the plaintiffs expressly invoked several cases that relied on Rule 53. The plaintiffs principally relied on *Stone v. City & Cnty. of S.F.*, 968 F.2d 850 (9th Cir. 1992). 2-ER-265. In *Stone*, the district court "appointed a Special Master," whose "reports were filed in accordance with Rule 53[]." 968 F.2d at 852, 858. In the specific footnote the plaintiffs in this case cited, *Stone* in turn used "special master" and "monitor" interchangeably, citing cases using both terms. *Id.* at 859 n.18 ("Federal courts repeatedly have approved the use of *special masters* to monitor compliance with court orders and consent decrees." (emphasis added)).

The plaintiffs cited *Mullen*, in which the district court appointed "a Special Master (hereafter 'Monitor') pursuant to Federal Rule of Civil Procedure 53." *Mullen*, 828 F.2d at 593. In fact, the plaintiffs expressly called out to the district court that *Mullen* "cit[ed] Fed. R. Civ. P. 53(b) for appointment of special master.". 2-ER-265.

The plaintiffs also cited *Thompson v. Enomoto*, 815 F.2d 1323 (9th Cir. 1987). 2-ER-265. *Thompson* involved a "Monitor" appointed as a special master under Rule 53. 815 F.2d at 1325.

49

Third, when the district court appointed the Monitor, the Monitor's role was consistent with the limitation in Rule 53 that a special master is limited to making recommendations. For example, the district court directed the Monitor to make "recommendations" and to first try to achieve consensus among the parties on an audit plan. 2-ER-233, ¶ 133; 2-ER-235, ¶ 139. But "[i]n the event the Parties cannot agree, the plan will be submitted to the Court for final approval." 2-ER-233, ¶ 133. In addition, the Monitor was defined as "a person or team of people who shall be selected to assess and report on the Defendants' implementation of this Order." 2-ER-188, ¶ dd; *see also* 2-ER-230–39. These roles and responsibilities, which are consistent with Rule 53, confirm that the district court was acting under that rule.

Fourth, the title given to the individual should not matter. A court should not be able to avoid the limitations of Rule 53 (or Article III of the Constitution) merely by calling the person a "monitor" instead of a "special master."

Although the order appointing the Monitor does not specify the source of the authority, the authority necessarily comes from Rule 53. As explained above, courts use "monitor" and "special master" interchangeably, the plaintiffs' request for the Monitor relied on Rule 53 caselaw, the Monitor's initial responsibilities were consistent with Rule 53, and the district court did not indicate that it was invoking any other source of authority.

For these reasons, the limitations of Rule 53 apply to the Monitor. The district court may delegate to the Monitor only advisory authority to make recommendations and oversee compliance with court orders. It cannot delegate to the Monitor the authority to control or make decisions for MCSO. It also cannot require MCSO to implement the Monitor's decisions. Further, the district court must provide for an unequivocal mechanism for de novo judicial review.

### C. The district court abused its discretion by giving the Monitor authority to make the final decision, which is not subject to any district court review.

The district court abused its discretion in giving the Monitor authority that goes far beyond what Rule 53 allows.

### 1. The district court abused its discretion by giving the Monitor final decision-making authority.

Some portions of the Third Order comply with Rule 53, just like they comply with Article III of the Constitution. For example, Paragraph 353 provides that the Monitor will make recommendations and the Court will make the final determination. 1-ER-13.

But again, paragraphs 346, 347, and 350 fall far outside Rule 53's bounds, just like they violated Article III. These paragraphs improperly give the Monitor "independent authority to make the ultimate decision" and to "determine whether training on investigative planning and supervision is needed." 1-ER-10, ¶ 346;

51

*accord* 1-ER-10, ¶ 347 ("independent authority to make the ultimate decision"); *see also* 1-ER-11, ¶ 350 (giving Monitor authority to "implement such training").

These paragraphs go beyond what Rule 53 allows. They do not merely result in an "order, report, or recommendation," as contemplated by Rule 53. Instead, they give the Monitor the power to make the ultimate decision on the activities of an independent governmental entity, and require MCSO to implement whatever the Monitor says.

This authority runs afoul of the principle that a special master should act in advisory capacity only. *See Microsoft*, 147 F.3d 955 (noting that a special master is "always advisory"); *Armstrong*, (noting that courts have only approved nonjudicial officers, including, special masters to act in "advisory capacities only"). In other words, "the present case goes far beyond the practice that has grown up under Rule 53." *Cobell*, 334 F.3d at 1142. "The Monitor's portfolio [is] truly extraordinary." *Id.* "The Monitor [is] not limited to superintending compliance with the district court's decree," but instead has the authority to direct the activities of an independent government entity. *Id.* at 1143 (quotation marks and citation omitted).

These paragraphs also violate the principle that "[m]asters may not be placed in control of governmental defendants for the purpose of forcing them to comply with court orders." *Mullen*, 828 F.2d at 545 (recognizing that it would have been impermissible for the monitor to control the governmental defendant because).

Because the district court violated Rule 53, the Court should vacate Paragraphs 346, 347, and 350.

### 2. The district court also abused its discretion by eliminating judicial review of the Monitor's decisions.

Paragraphs 346, 347, and 350 also improperly depart from Rule 53 because they provide no opportunity for a hearing, even though "the court must give the parties notice and an opportunity to be heard." Fed. R. Civ. P. 53(f)(1).

When a court appoints a special master with a proper scope, the availability of de novo review may not create much of an issue. When the special master submits the report or recommendation, Rule 53 provides for judicial review. *See* Fed. R. Civ. P. 53(f). Here, by contrast, giving the Monitor authority to make decisions and implement changes unilaterally does not allow for an obvious opportunity for judicial review. By the time MCSO could seek review, the Monitor already would have implemented his decision. For example, if the Monitor has already "change[d] [a] designation" in an individual case, as allowed by ¶ 347, judicial review—even if available—may not provide any practical relief. Similarly, if the Monitor has already "implement[ed] . . . training" he selected, as authorized by ¶ 350, post hac judicial review can offer nothing for training that has already occurred.

In this context, therefore, the district court must explicitly provide for judicial review. *See Armstrong*, 768 F.3d at 988 ("While the district court might have intended the [special master's] decision to be subject to review or appeal, that

intention is not reflected in its order."). *Armstrong*, 768 F.3d at 988 (reversing appointment of nonjudicial officer); *Microsoft*, 147 F.3d 955 (requiring an "unequivocal commitment to non-deferential review").

For this separate reason, the Court should also vacate Paragraphs 346, 347, and 350.

## III. The Third Order violates Federal Rule of Civil Procedure 65 by not stating the terms of the injunction specifically.

### A. Federal Rule of Civil Procedure 65 prohibits injunctions that vest a nonjudicial officer with discretion to determine the terms of the injunction.

Under Fed. R. Civ. P. 65, which governs injunctions, "Every order granting an injunction must . . . state its terms specifically . . . [and] describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citing 11 Wright & Miller, *Federal Practice and Procedure* § 2955). "Rule 65(d) is satisfied 'only if the enjoined party can ascertain from the four corners of the order precisely what acts are forbidden or required.'" *Mickalis*, 645 F.3d at 144 (citation omitted).

"[I]njunctions that do not satisfy the requirements of Rule 65(d) 'will not withstand appellate scrutiny.'" *Id.* (quoting *Corning Inc. v. PicVue Elecs., Ltd.*, 365

F.3d 156, 158 (2d Cir. 2004) (per curiam)). For example, an injunction violates Rule 65 if it gives a nonjudicial officer the authority to dictate what a party must do. In *Mickalis*, the district court issued an injunction mandating that the defendant "shall adopt those practices that in the opinion of the Special Master serve to prevent in whole or in part the illegal sale of firearms." 645 F.3d at 142. The injunction similarly required that the defendant "shall also adopt those prophylactic practices that in the opinion of the Special Master will serve to prevent the movement of guns into the illegal market." *Id.*

Applying Rule 65(d)'s requirement that an injunction must "state its terms specifically," the Second Circuit found that the injunctions improperly "vest[ed] the Special Master with discretion to determine the terms of the injunctions themselves." *Id.* at 145. The appellate court therefore held that these "sweeping delegations of power to the Special Master violate[d] Rule 65(d)." *Id.*; s*ee also Microsoft*, 147 F.3d at 954 ("injunction was improper insofar as 'the parties' rights must be determined, not merely enforced,' by special master"). Accordingly, the appellate court vacated the provisions of the injunctions that "require[d] the defendants to 'adopt those practices that *in the opinion of the Special Master* serve to prevent in whole or in part the illegal sale of firearms' and 'adopt those prophylactic practices that *in the opinion of the Special Master* will serve to prevent the movement of guns into the illegal market.'" *Mickalis*, 645 F.3d at 145 (emphasis in original).

In sum, a district court must state in an injunction the terms that require the party's compliance. An injunction violates Rule 65 if it allows someone other than an Article III judge to specify precisely what a party must do.

**B.** **The district court abused its discretion by giving the Monitor the authority to determine the terms of the injunction.**

Here, Rule 65 unquestionably applies. By its own terms the Third Order is a "Permanent Injunction," and it directs what MCSO must do. 1-ER-2. The problem is that the injunction does not directly tell MCSO what to do, but instead tells MCSO that MCSO must do what the Monitor says to do. The Third Order therefore violates Rule 65.

As with the prior two issues, some aspects of the Third Order comply with Rule 65 by describing with specificity what MCSO must do, or cannot do. But the same three paragraphs discussed above (¶¶ 346, 347, 350) violate Rule 65. Paragraph 346 gives the Monitor the authority to "make determinations and establish policy decisions pertaining to backlog reduction," which MCSO must implement. 1-ER-10, ¶ 346. Paragraph 347 commands that "[t]he Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision." 1-ER-10, ¶ 347. Paragraph 350 gives the Monitor authority to "implement such training," which will be mandatory for MCSO. 1-ER-11, ¶ 350.

In other words, the injunction tells MCSO to do what the Monitor says to do. The injunction therefore does not "state its terms specifically," and does not

"describe in detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). The Third Order does not refer to another *document*, which would be prohibited by Rule 65. It does something even worse—it refers to another *person*. A person who does not wear a black robe.

By allowing the Monitor to tell MCSO what to do, the district court improperly "delegated broad power to determine the content of an injunction." *Mickalis*, 645 F.3d at 145. These "sweeping delegations of power to the [Monitor] violate Rule 65(d)." *Id.* This means that the Third Order itself does not specify what MCSO must do, and consequently it is "not possible to ascertain from the four corners of the order precisely what acts are forbidden." *Corning*, 365 F.3d at 158 (quotation marks and citation omitted).

This case shows why these principles exist. If MCSO does not do what the Monitor says to do, it will find itself in contempt. All for not following the commands of a nonjudicial officer. That is not how Rule 65 works. For an injunction to state its terms specifically, as required by Rule 65, it must state them directly, not by reference to a nonjudicial officer. For an injunction to be valid, the *court* must tell the party what to do.

By failing to do so, the district court erred as a matter of law and abused its discretion in entering the Third Order.

## CONCLUSION

The Court should reverse the district court, vacate paragraphs 346, 347, and 350 of the Third Order, and remand for further proceedings.

RESPECTFULLY SUBMITTED this 20th day of June, 2023.

OSBORN MALEDON, P.A.

By s/Eric M. Fraser
    Eric M. Fraser
    Brandon T. Delgado
    2929 North Central Avenue, Suite 2100
    Phoenix, Arizona  85012

**Attorneys for Paul Penzone**
**Defendant/Appellant**

# STATEMENT OF RELATED CASES

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 23-15036

The undersigned attorney or self-represented party states the following:

☒ I am unaware of any related cases currently pending in this court.

☐ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/Eric M. Fraser          **Date** 6/20/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

59

# CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-15036

I am the attorney or self-represented party.

**This brief contains 12,382 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties;
    ☐ a party or parties are filing a single brief in response to multiple briefs; or
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Eric M. Fraser      **Date** 6/20/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

60