No. 23-15036

**United States Court of Appeals
for the Ninth Circuit**

_____

MANUEL DE JESUS ORTEGA MELENDRES, on behalf of himself and all others similarly situated, et al.,

*Plaintiffs-Appellees*,

and

UNITED STATES OF AMERICA,

*Plaintiff-Intervenor-Appellee*,

v.

PAUL PENZONE, in his official capacity as Sheriff of Maricopa County, Arizona,

*Defendant/Appellant.*

_____

On Appeal from the United States District Court for the
District of Arizona, Phoenix Cause No. 2:07-cv-02513-GMS

**REPLY BRIEF**

Eric M. Fraser
Brandon T. Delgado
OSBORN MALEDON, P.A.
2929 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 640-9000
efraser@omlaw.com
bdelgado@omlaw.com

**Attorneys for Defendant/Appellant
Paul Penzone**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................4

ARGUMENT ........................................................................................7

I.    The Third Order Violates Article III of the U.S. Constriction by giving the Monitor ultimate decision-making authority to adjudicate the appropriate injunctive relief.....................................................7

    A.    *Plata* and *Morgan* do not stand for the proposition that a nonjudicial officer such as a receiver can exercise final judicial decision-making authority......................................8

    B.    Contrary to the plaintiffs' and United States' contentions, the district court's delegation of authority to the Monitor did not stay within constitutional limits. .........................................14

    C.    *Armstrong* and *Microsoft* apply with full force. ................19

    D.    The district court independently abused its discretion by not providing an unequivocal mechanism for de novo judicial review of the Monitor's decisions.......................................21

        1.    This Court's precedent requires an unequivocal mechanism for judicial review of a nonjudicial officer's decisions. ...................................................21

        2.    There is no mechanism for judicial review..............................23

            (a)    The First Order's judicial review provisions do not unequivocally provide for review of the Monitor's decisions pursuant to Paragraphs 346, 347, and 350 of the Third Order. ...................................23

            (b)    The briefing in the district court cannot circumvent the clear text of Paragraphs 346, 347, and 350...............................................27

3.      Vacating Paragraphs 346, 347, and 350 is appropriate under this Court's precedent and because even if this Court remanded to the district court for it to add a mechanism for judicial review, it would not save the Third Order. ............................................................................28

II.     The Third Order violates Rule 53. ...............................................30

III.    The Third Order violates Rule 65 ...............................................36

        A.      The plaintiffs and United States ignore the delegation of power issue and focus on provisions that MCSO does not challenge in this appeal. ......................................................36

        B.      *Fortyune* does not apply here. ..........................................39

IV.     The Court should consider MCSO's challenge to Paragraph 350. ...............40

CONCLUSION .............................................................................41

STATEMENT OF RELATED CASES .................................................42

CERTIFICATE OF COMPLIANCE ....................................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ..................................................................*passim*

*Baccei v. United States*,
632 F.3d 1140 (9th Cir. 2011) ..................................................................41

*Benjamin v. Fraser*,
343 F.3d 35 (2d Cir. 2003) ..................................................................34

*Brown v. Plata*,
563 U.S. 493 (2011)..................................................................12

*Caiozzo v. Koreman*,
581 F.3d 63 (2d Cir. 2009) ..................................................................34

*City of New York v. Mickalis Pawn Shop*,
LLC, 645 F.3d 114 (2d Cir. 2011)..................................................16, 36, 37

*Cobell v. Norton*,
334 F.3d 1128 (D.C. Cir. 2003) ..................................................................31

*Dixon v. Barry*,
967 F. Supp. 535 (D.D.C. 1997)..................................................................12

*F.T.C. v. World Wide Factors, Ltd.*,
882 F.2d 344 (9th Cir. 1989) ..................................................................34

*Fortyune v. Am. Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004) ..................................................................39

*Jenkins by Agyei v. State of Mo.*,
890 F.2d 65 (8th Cir. 1989) ..................................................................34

*Lewis v. Kugler*,
446 F.2d 1343 (3d Cir. 1971) ..................................................................13

*Morgan v. McDonough*,
540 F.2d 527 (1st Cir. 1976)..................................................7, 9, 10

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................................ 16

*Nat'l Org. for Reform of Marijuana Laws v. Mullen*,
    828 F.2d 536 (9th Cir. 1987) ........................................................... 31

*People v. Torres*,
    No. F046161, 2005 WL 2742819 (Cal. Ct. App. Oct. 25, 2005) ....... 17

*Plata v. Schwarzenegger*,
    603 F.3d 1088 (9th Cir. 2010) ...................................................*passim*

*Pollinator Stewardship Council v. E.P.A.*,
    806 F.3d 520 (9th Cir. 2015) ........................................................... 30

*Ruiz v. Estelle*,
    679 F.2d 1115 (5th Cir.) ..................................................................... 7

*Ruiz v. Estelle*,
    688 F.2d 266 (5th Cir. 1982) ............................................................. 7

*Schmidt v. Lessard*,
    414 U.S. 473 (1974) .......................................................................... 40

*Schwimmer v. United States*,
    232 F.2d 855 (8th Cir. 1956) ........................................................... 35

*Solis v. Matheson*,
    563 F.3d 425 (9th Cir. 2009) ........................................................... 11

*United States v. Microsoft*,
    147 F.3d 935 (D.C. Cir. 1998) ....................................................*passim*

*Washington v. United States*,
    444 U.S. 816 (1979) .......................................................................... 13

*Washington v. Washington State Com. Passenger Fishing Vessel
    Ass'n*,
    443 U.S. 658 (1979) .......................................................................... 13

**Constitutional Provisions**

Article II ........................................................................................18

Article III....................................................................*passim*

**Statutes & Rules**

18 U.S.C. § 3626................................................................8

28 U.S.C. § 561 ................................................................18

Fed. R. Civ. P. 53 .....................................................*passim*

Fed. R. Civ. P. 65 .....................................................*passim*

Fed. R. Civ. P. 706 ..........................................................21

Judiciary Act of 1789, 1st Cong., ch. 20, § 27, 1 Stat. 73 (1789) ..........................18

**Other Authorities**

Wright & Miller, 12 *Fed. Prac. & Proc. Civ.* § 2983 (3d ed.)...............................11

16A Am. Jur. 2d *Constitutional Law* § 310 ............................................17

# ARGUMENT

## I. The Third Order Violates Article III of the U.S. Constriction by giving the Monitor ultimate decision-making authority to adjudicate the appropriate injunctive relief.

The plaintiffs and United States do not dispute that only Article III judges, who are appointed by the President and confirmed by the Senate, can exercise the judicial power of the United States. They also do not dispute that a district court cannot delegate final judicial power to a nonjudicial officer, nor do they dispute that nonjudicial officers cannot act as a "roving federal district court." *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir.), *amended in part on rehearing*, 688 F.2d 266 (5th Cir. 1982).

Instead, the plaintiffs and United States raise three main arguments. First, they cite to two supposed exceptions to the rule, in *Plata v. Schwarzenegger*, 603 F.3d 1088 (9th Cir. 2010), and *Morgan v. McDonough*, 540 F.2d 527 (1st Cir. 1976). Second, they claim that the Monitor is merely implementing the district court's orders, not exercising independent authority to make the ultimate decision. Third, they contend that *Armstrong* and *Microsoft* are distinguishable. These arguments do not warrant affirming.

**A.** ***Plata* and *Morgan* do not stand for the proposition that a nonjudicial officer such as a receiver can exercise final judicial decision-making authority.**

The plaintiffs (at 25–28) and United States (at 30–33) claim that in two instances, *Plata* and *Morgan*, an appellate court supposedly affirmed the district court giving judicial authority to a nonjudicial officer.

First, neither case raised or addressed the issue presented here, which is whether delegating to a nonjudicial officer the judicial power to determine the final appropriate injunctive relief, without district court review, violates Article III.

In *Plata*, the state did not challenge "the court's authority to appoint a receiver" and "took no appeal" from the order appointing the receiver. 603 F.3d at 1097. The appeal (which arose several years after the district court gave the receiver its powers) involved three discrete issues. *Id.* at 1093–99. Specifically, the Court addressed only (1) whether a specific statute (the Prison Litigation Reform Act) "bar[red] the district court from appointing a receiver" (2) whether the receivership was the least intrusive means of remedying the constitutional violation at issue (which is the standard for prospective relief under the Prison Litigation Reform Act),[1] and (3) whether the district court's refusal to terminate the receiver's construction plan was an appealable order or an unappealable interlocutory order. *Plata*, 603 F.3d at 1093–99.

---

[1] 18 U.S.C. § 3626(a)(1)(A).

8

In *Plata*, therefore, no party raised, and this Court did not consider, any arguments about the Constitution, Article III, the role of nonjudicial officers, or delegating judicial power. The only arguments concerning the scope of power were based solely on a statute that has nothing to do with this appeal.

The appellate court in *Morgan* also did not address any constitutional questions about the delegation of final judicial power to a nonjudicial officer. Although the appellate court recognized that "receiverships are and have for years been a familiar equitable mechanism," the court simply did not address the question at issue in this case. 540 F.2d at 533. Instead, the dispute centered around the court supplanting the local government, which is an issue not in dispute here. 540 F.2d at 533. MCSO does not dispute that the *district court* has the power to direct MCSO to take specific actions, subject to ordinary constitutional and procedural requirements. The issue is whether the district court has authority to delegate that power to someone who was not appointed by the President and confirmed by the Senate.

Second, in *Plata* and *Morgan* the district court retained ultimate judicial decision-making authority over the receiver's actions and plans. In *Plata*, the district court directed "the Receiver to prepare a 'Plan of Action' for remedying the constitutional violations." 603 F.3d at 1092. Consistent with that requirement, "the Receiver filed numerous motions and revised plans of action, many of which

9

concerned the construction of new facilities and all of which, until mid-2008, met with the approval or acquiescence of the State." *Id.* Later, "the Receiver requested $204.6 million in previously appropriated funds from the State for the implementation of its final, court-approved plan of action." *Id.* When the State denied this request, the district court made the ultimate decision and "issued an order directing the State to transfer $250 million to the Receiver." *Id.*

Similarly, in *Morgan* the district court directed the receiver to "file a plan." 540 F.2d at 529. The district court also ordered the receiver to "make recommendations to the court relative to certain provisions of the plan." *Id.* But ultimately the "citywide desegregation plan [was] formulated by the district court." *Id.*

In contrast, the Monitor here has the independent authority to make the ultimate decision on what policies, decisions, and training MCSO must implement. 1-ER-10–11, ¶¶ 346, 347, 350. It can do all of this without district court approval or review.

Third, *Plata* and *Morgan* both involve court-appointed receivers. Even if *Plata* and *Morgan* represent exceptions to the general prohibition against delegating judicial power to a nonjudicial officer, nothing in the opinions indicate that they apply outside the context of a receiver.

In addition, the appointment of a receiver "is usually specifically sought" by a plaintiff. *Solis v. Matheson*, 563 F.3d 425, 437 (9th Cir. 2009). Recognizing a receiver may oust a defendant "from control," the Court has warned that "the appointment of a receiver is considered to be an extraordinary remedy that should be employed with the utmost caution . . . ." *Id.* (citation omitted). Accordingly, "[i]n general, a receiver should not be appointed without notice being given." *Id.* at 438. In addition, "the law requires that a court, before it may take such an action, must consider a variety of factors as a matter of equity." Appointment of Receivers, Wright & Miller, 12 *Fed. Prac. & Proc. Civ.* § 2983 (3d ed.). For example, courts consider "the inadequacy of available legal remedies, and the harm to the plaintiff if the request for a receivership is denied." *Solis*, 563 F.3d at 438.

In *Solis*, the Court observed "the Complaint did not mention or plead any facts supporting a receivership" and "did not request receivership as a form of relief." *Id.* The Court also implicated the rule that "the district court should have made findings on the relevant factors to support the appointment of a receiver." *Id.* The Court therefore vacated the portion of the judgment that appointed the receiver. *Id.*

Here, it is undisputed that the district court did not appoint a receiver, provide notice that it was appointing a receiver, or consider the factors for appointing a receiver. Therefore, even if the district court could give a receiver certain powers, *Plata* and *Morgan* should not be extended beyond the unique context of a receiver.

The remaining authorities cited by the plaintiffs and United States likewise do not warrant affirming. For example, the plaintiffs (at 25 n.6, 29) and United States (at 31 n.7) cite several district court decisions. But the issue on appeal here is whether the *district court* has the constitutional authority to delegate its power to a nonjudicial officer. Citing other *district court* decisions does not answer the question of whether this is a proper exercise of the judicial power.

In addition, all of these decisions also involve a receiver and do not address an Article III challenge to a district court's delegation of judicial power. For example, in *Dixon v. Barry*, 967 F. Supp. 535, 551 (D.D.C. 1997), the district court appointed a receiver and addressed "one substantial legal attack", which was whether the *district court* could interfere with "the operation of the local government." *Id.* The *district court*'s powers are not directly at issue here. The question is whether the district court may *delegate* its judicial power to the Monitor to decide what MCSO must do.

The other appellate court cases cited by the plaintiffs and United States similarly involve the general principle that a court can appoint a receiver and do not involve an Article III challenge to a receiver's final decision-making power. The United States cites (at 29) *Brown v. Plata*, 563 U.S. 493, 511 (2011), for the principle that a court "may not allow constitutional violations to continue simply because a remedy would involve intrusion in the realm of government administration." MCSO

does not dispute this general principle. This principle, however, does not mean a district court can delegate its judicial power to a nonjudicial officer.

The United States also cites (at 29) *Lewis v. Kugler*, 446 F.2d 1343, 1351 n.18 (3d Cir. 1971). *Lewis* did not involve a nonjudicial officer at all. In describing the district court's equitable powers, the appellate court merely noted that the district court could appoint a receiver. *Id.*

In *Washington*, the court made a general observation—that the "federal court" can "displace local enforcement" by enlisting the "aid of the appropriate federal law enforcement agents." *Washington v. Washington State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 695 (1979), *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979). A nonjudicial officer's powers were not at issue.

\*     \*     \*

In sum, the cases cited by the plaintiffs and United States do not support the proposition that a district court can delegate final judicial decision-making authority to a nonjudicial officer. None of the cases confronted or announced any holding regarding the specific issue in this case about the limits of delegating Article III power.

**B.** **Contrary to the plaintiffs' and United States' contentions, the district court's delegation of authority to the Monitor did not stay within constitutional limits.**

The plaintiffs claim (at 31) that the "Monitor's role is ministerial in the sense that the Monitor is to implement the remedial measures already decided and specified by the district court, using the limited powers described in Paragraphs 346, 347, 350." They further claim (at 30–31) that the district court did not violate Article III because it did not vest the Monitor with an "adjudicatory function."

Contrary to their contention, however, the district court delegated much more than merely ministerial authority. As MCSO's opening brief explained (at 39–42, 56–57), the court delegated its injunctive power to the Monitor to decide for itself what MCSO must do. Paragraph 346 allows the Monitor to "make determinations and establish policy decisions pertaining to backlog reduction," which MCSO must implement. 1-ER-10, ¶ 346. Under this paragraph, the Monitor has the "independent authority to make the ultimate decision." *Id.* Paragraph 347 commands that the "Monitor shall revise and/or formalize MCSO's intake and routing processes" and "[t]he Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision." *Id.*, ¶ 347. Again, the Monitor's power is "ultimate" and "independent." *Id.* Paragraph 350 gives the Monitor authority to "determine whether training on investigative planning and supervision is needed and implement such training." 1-ER-11, ¶ 350.

14

These paragraphs confirm that the Monitor does not merely have a ministerial function. Perhaps the district court could have made policy decisions and directed the Monitor to implement them, but instead Paragraph 346 has the Monitor "make determinations and establish policy decisions." 1-ER-10, ¶ 346. Perhaps the district court could have revised intake and routing processes and instructed the Monitor to supervise them, but instead Paragraph 347 gives the Monitor the direct power to "revise" those processes. *Id.*, ¶ 347. Likewise, perhaps the district court could have determined what training MCSO needed and told the Monitor to deliver the training, but Paragraph 350 has the Monitor making the initial determination not only about what training is needed, but even whether training is needed at all. 1-ER-11, ¶ 350. These powers are not merely ministerial; they go far beyond merely implementing a decision rendered by the court. And they go far beyond making recommendations. *See Armstrong v. Brown*, 768 F.3d 975, 987–88 (9th Cir. 2014) (noting the Court has only approved of nonjudicial officers when they were "specifically limited . . . to making recommendations").

In sum, the district court delegated to a nonjudicial officer the independent adjudicatory power to decide what injunctive relief is ultimately appropriate, which MCSO must implement. This violates Article III. *See United States v. Microsoft*, 147 F.3d 935, 954 (D.C. Cir. 1998) (rejecting the plaintiff's argument that the nonjudicial officer was just "supervising" and noting that the injunction was

improper insofar as "the parties' rights must be determined, not merely enforced," by nonjudicial officer); *City of New York v. Mickalis Pawn Shop*, LLC, 645 F.3d 114, 145 (2d Cir. 2011) ("Serious constitutional questions arise when a master is delegated broad power to determine the content of an injunction as well as effectively wield the court's powers of contempt."). Accordingly, the district court has improperly delegated its judicial power to the Monitor to decide what "acts or act are restrained or required" by MCSO. Fed. R. Civ. P. 65 (the "court" has the judicial power to issue injunctive relief).

The plaintiffs (at 24–30) and United States (at 28–35) also contend that the Monitor's powers fall within the permissible range of the district court's equitable powers, again pointing to the receivership in *Plata* and the broad discretion of the district court.

Although the intractable nature of these proceedings and the experience of the district court afford the court broad discretion, that discretion does not extend to delegating judicial power to a nonjudicial officer.

*Plata* confirms that the Monitor's powers go beyond that of a permissible receivership under Article III. This Court recognized in *Plata* that a receiver is "appointed . . . to take over the day-to-day management" of a governmental entity. 603 F.3d at 1094. Putting aside that the district court here did not appoint a receiver, receivers still cannot exercise ultimate judicial power. *See N. Pipeline Constr. Co.*

16

*v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 (1982) ("The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III."). In other words, "[w]hile it is certainly not inappropriate for a court to engage others, such as referees, receivers, and attorneys, to assist the court in carrying out the decision-making process, the court cannot abandon its constitutional and statutory obligations to itself make the ultimate determination . . . ." *People v. Torres*, No. F046161, 2005 WL 2742819, at *4 (Cal. Ct. App. Oct. 25, 2005); *see also* 16A Am. Jur. 2d *Constitutional Law* § 310 ("Federal courts are not prohibited from using nonjudicial officers to support judicial functions *as long as the judicial officer retains and exercises ultimate responsibility*." (emphasis added)).

Consistent with Article III, the district court in *Plata* maintained ultimate decision-making authority over the receiver's actions. The receiver filed a plan that had to be approved by the court. 603 F.3d at 1092. It had to request court action when it wanted to change that plan. *Id.* And when the State objected to the receiver's plan, the district court issued the final decision. *Id.*

In contrast, here the district court gave the Monitor powers beyond those of even a properly appointed receiver. As explained above (Argument § I.B), rather than implementing a court-approved plan as in *Plata*, the Monitor has the "independent" and "ultimate" authority to make decisions and establish policies to reduce MCSO's backlog, which MCSO must implement. 1-ER-10, ¶¶ 346, 347.

17

The Monitor also gets to "determine whether training . . . is needed and implement such training." 1-ER-11, ¶ 350. The Monitor can make all these decisions without final court approval or review.

In addition, the plaintiffs assert (at 24) that the Monitor's authority "is limited in both scope and time," but they cite nothing establishing an exception to Article III under which a district court can delegate its authority so long as it is limited in scope and time. Tellingly, the United States does not assert this standard.

The plaintiffs' analogy involving the U.S. Marshals Service highlights their analytical flaw. They present (at 33–34) an example of a district judge ordering a marshal to remove someone from a courtroom. Here, however, the U.S. marshals are agents of the executive under Article II of the Constitution, acting under authority granted by the Congress under Article I. In the Judiciary Act of 1789, the very first Congress enacted "That a marshal shall be appointed in and for each district," with authority "to execute throughout the district, all lawful precepts directed to him, and issued under the authority of the United States . . . ." Judiciary Act of 1789, 1st Cong., ch. 20, § 27, 1 Stat. 73, 87 (1789). Each U.S. Marshal is appointed by the President and confirmed by the Senate, and serves in the executive branch within the Department of Justice. *See* 28 U.S.C. § 561(c) ("The President shall appoint, by and with the advice and consent of the Senate"); 28 U.S.C. § 561(a) ("as a bureau within the Department of Justice under the authority and direction of the Attorney

General").  Unlike the Monitor, therefore, the U.S. Marshals Service operates under authority from all three branches of government.

In addition, the plaintiffs claim (at 34) that "the marshals' decision-making authority on that issue is not judicial in nature."  That's because the marshals act under their own authority as law enforcement officers.  Here, by contrast, the authority delegated to the Monitor is not ministerial.  As explained above, the district court delegated authority to "make determinations and establish policy decisions," among other things.  1-ER-10, ¶ 346.

### C.    *Armstrong* and *Microsoft* apply with full force.

In *Armstrong*, the Court emphasized although it has approved of nonjudicial officers, "those appointments specifically limited the expert to making recommendations subject to review by the district court."  768 F.3d at 987–88.  The plaintiffs attempt (at 31) to distinguish *Armstrong* by asserting that it "actually did involve the delegation of judicial power to a nonjudicial officer."

Contrary to the plaintiffs' contention, however, *Armstrong* applies here because it correctly recognizes that a district court may not delegate its judicial power.  As explained above (Argument § I.B.), the district court here vested the Monitor with the judicial power to adjudicate the appropriate injunctive relief by allowing the Monitor to tell MCSO what to do, without first running that decision by the district court.  The plaintiffs assert (at 32) that the "present case is entirely

different" in that the Monitor has "no such authority to resolve disputes, find facts, or determine the law." But the district court gave the Monitor the power to "make determinations and establish policy decisions." 1-ER-10, ¶ 346. That is resolving disputes and finding facts. It gave the Monitor the power to "determine whether training . . . is needed." 1-ER-11, ¶ 350. That is finding facts. The plaintiffs assert (at 32) that in *Armstrong*, the nonjudicial officer's determinations were "final." Likewise here, the district court gave the Monitor "independent authority to make the ultimate decision." 1-ER-10, ¶¶ 346, 347. *Armstrong* applies.

The plaintiffs try (at 32–33) to distinguish *Microsoft* on the same bases. In *Microsoft*, the court applied the rule that a nonjudicial officer such as a special master is "always advisory." 147 F.3d at 955. Consistent with this rule, it also invoked the principle that injunctions are improper insofar as "the parties' rights must be determined, not merely enforced," by a nonjudicial officer. *Id.* at 954. The plaintiffs assert (at 33) that the Monitor here was appointed "to *implement*" the district court's orders. As explained above, however, that simply isn't true. (*See* Argument § I.B.) The district court gave the Monitor the power to make independent determinations and enforce those determinations.

20

**D.    The district court independently abused its discretion by not providing an unequivocal mechanism for de novo judicial review of the Monitor's decisions.**

**1.    This Court's precedent requires an unequivocal mechanism for judicial review of a nonjudicial officer's decisions.**

As MCSO's opening brief explained (at 36–38), an injunction that does not provide a "mechanism for review" of a nonjudicial officer's decisions risks displacing "'the district court's judicial role.'" *Armstrong*, 768 F.3d at 988 (citation omitted). The order must specify the opportunity for judicial review. It is not enough if "the district court might have intended the expert's decision to be subject to review or appeal . . . ." *Id.* Other courts likewise require an "unequivocal commitment to non-deferential review." *Microsoft*, 147 F.3d at 954-55.

Although the plaintiffs do not dispute (at 41) this requirement, the United States contends (at 23) that the district court need not expressly provide for judicial review of the Monitor's decisions.

The United States notes (at 25) that *Armstrong* involved a Rule 706 expert and that Rule 706 does not apply to the Monitor. But *Armstrong*'s reasoning for requiring an express mechanism for judicial review does not mention Rule 706 at all. 768 F.3d at 988. And *Armstrong*'s analysis on limiting nonjudicial officers to recommendations did not solely turn on the fact that the nonjudicial officer was an expert under Rule 706. *Id.* at 987–88. The Court invoked the broader principle that it has only approved of "non-judicial officers to make recommendations." *Id.* at 987.

21

*Microsoft* also applies. The United States points out (at 25–26) that at the time of *Microsoft*, Rule 53 did not allow for de novo review, and this is why the court refused to infer a mechanism of de novo review. Although the D.C. Circuit noted this barrier, it was not dispositive. 147 F.3d at 955. Without referencing the rule in effect at the time, the court found that the district court's order did not in fact contain a judicial review mechanism, and therefore it "would have to vacate it, subject to possible re-issuance with an unequivocal commitment to non-deferential review." *Id.*

The United States cites (at 24) *Plata* for the proposition that a district court need not provide a mechanism for judicial review. *Armstrong* (2014), however, was decided after *Plata* (2010).[2] This Court's precedent therefore did not require a mechanism for judicial review at the time of *Plata*, but it does now after *Armstrong*. In any event, the takeaway from the portion of *Plata* cited by the United States is that when the appellant tried to raise its objections in this Court, the Court rejected it because the appellant specifically "opposed an evidentiary hearing in the district court." 603 F.3d at 1098. That is not the issue here.

---

[2] The United States incorrectly lists *Plata*'s date as 2020. It was in fact decided in 2010.

Because the United States fails to undermine this Court's precedent as applied to this case, the Court should apply the rule that the district court must provide an unequivocal mechanism for judicial review of the Monitor's decisions.

### 2. There is no mechanism for judicial review.

Recognizing that the Third Order provides no judicial review for Paragraphs 346, 347, and 350, the plaintiffs (at 35–42) and United States (at 21–23) make several arguments asserting that there is judicial review. These arguments fail.

> **(a)** **The First Order's judicial review provisions do not unequivocally provide for review of the Monitor's decisions pursuant to Paragraphs 346, 347, and 350 of the Third Order.**

The plaintiffs begin (at 36–38) by asking the Court to "read" the First Order's judicial review provisions as if they applied to the Third Order. The plaintiffs explain (at 36) that the First Order provides that the Monitor will be subject to the "orders of the Court." The Third Order is an order of the court, which provides that the Monitor has the "independent authority to make the ultimate decision" and "determine whether training is needed," which in turn MCSO must expeditiously implement. 1-ER-10–11, ¶¶ 346, 347, 350. The plaintiffs do not explain how there would be any judicial review in light of this unambiguous text. By contrast, the Third Order has its own judicial review provisions for other paragraphs. 1-ER-13, ¶ 353.

Compare these provisions, both from the Third Order, which confirm that the district court knew how to establish a mechanism for judicial review:

| | |
|---|---|
| "The Monitor shall then, promptly present to the Court the final proposed policies he deems best. The parties will have two weeks thereafter to provide the Court with any comments on the Monitor's final proposed policies. *The Court will, thereafter, make determinations as to the final policies.*"<br><br>1-ER-13, ¶ 353 (emphasis added). | "The Monitor must consult with the PSB Commander about these policy decisions but maintains *independent authority to make the ultimate decision.*"<br><br>1-ER-10, ¶ 346 (emphasis added); *accord id.*, ¶ 347. |

Paragraph 353 provides judicial review. Paragraphs 346 and 347 do not.

The plaintiffs then cite (at 36) the First Order's provision stating that the "Monitor shall be subject to the supervision" of the court. But the fact that the Monitor is being supervised by the Court does not establish an unequivocal "mechanism for review." *Armstrong*, 768 F.3d at 988. The plaintiffs also cite (at 39) that the "ultimate arbiter of compliance is the Court." Compliance is a separate issue than the decisions the Monitor makes under Paragraphs 346, 347, and 350.

The plaintiffs quote (at 36) Paragraph 125 of the First Order. It states, "Should any Party determine that the Monitor's individual members, agents, employees, or independent contractors have exceeded their authority or failed to satisfactorily perform the duties required by *this Order*, the Party may petition the Court for such relief as the Court deems appropriate." 2-ER-230, ¶ 125 (emphasis added). They

further cite (at 36) that the First Order allows the parties to "submit their grievances directly to the Court for resolution" where "*the Order* provides for input from the Monitor." 2-ER-231, ¶ 128 (emphasis added). The First Order, however, specifies that "'Order' means this Order," i.e., the First Order. 2-ER-184, ¶ 1.g.

More fundamentally, those provisions do not provide for the type of review required by *Armstrong* and *Microsoft*. For example, if MCSO disagrees with the Monitor that a complaint should be handled by a Division instead of the Professional Standards Bureau, that would not "exceed [his] authority" because the Third Order expressly gives the Monitor the authority to make such determinations. The problem is that he should not have that authority in the first place.

Moreover, when read together, the First, Second, and Third Orders show that the First Order judicial review provisions do not apply to the Third Order. The plaintiffs point out (at 36–37) that the Second Order states that its paragraphs are "numbered consecutively to those set forth" in the First Order, which are expressly "incorporated herewith." 2-ER-124. Unlike the Second Order, however, the Third Order does not incorporate any previous order. 1-ER-7. If the district court intended for the First Order to be incorporated into the Second Order, it could have done so like it did in the Second Order. The fact that the Third Order has its own judicial review provisions further shows that the First Order provisions do not apply. And in any event, as explained above even the First Order does not provide for judicial

25

review for the types of decisions the Monitor would be making under Paragraphs 346, 347, and 350.

The plaintiffs also assert (at 37) that the Monitor assesses MCSO's compliance with the Third Order under the First Order compliance procedure. But the use of the same assessment mechanism does not mean that there is a mechanism for judicial review of the Monitor's decisions under Paragraphs 346, 347, and 350.

The remaining provision that the plaintiffs cite (at 38) further confirms that not only did the district court not provide a judicial mechanism for judicial review, but it also did not intend for there to be one. The First Order sets out how the Monitor will be paid. 2-ER-229–30, ¶¶ 123–24. The Monitor is paid via the same procedure for its duties under the Third Order. But the Third Order states this explicitly. It provides that the Monitor will continue to be paid "consistent with ¶ 123 of the [First Order]." 1-ER-14, ¶ 359. The Third Order does not do the same for the judicial review provisions in the First Order.

In sum, the district court knew how to provide a mechanism for judicial review, and did so for some aspects of the Third Order (1-ER-13, ¶ 353), but not for the provisions at issue here. The district court knew how to incorporate the First Order, and did so in the Second Order (2-ER-124), but did not do so in the Third Order. The district court knew how to reinvoke specific portions of the First Order, and did so in the Third Order for payment (2-ER-229–30, ¶¶ 123–24), but did not

do so for judicial review. And to top it off, inapplicable provisions for judicial review would not allow for the type of judicial review required by *Armstrong* and *Microsoft*.

**(b)** **The briefing in the district court cannot circumvent the clear text of Paragraphs 346, 347, and 350.**

Relying on the briefing in the district court, the plaintiffs (at 39–40) and United States (at 22–23) assert that the phrases "independent authority" and "ultimate decision" refer to the Monitor's power with respect to the Sheriff. They argue that no party asked for judicial review to be eliminated and that they asked for the district court to provide for judicial review.

But as demonstrated in the opening brief (at 24–26), this is not the first time that the district court went the other way by not adopting any of the parties' specific proposals. In any event, the Third Order must provide an unequivocal "mechanism for review," regardless of what the court may have "intended" in light of the parties' briefing. *Armstrong*, 768 F.3d at 988; *see also Microsoft*, 147 F.3d at 954–55 (requiring an "unequivocal commitment to non-deferential review" regardless of what the court may have "intended").

The plaintiffs essentially ask this Court to read into the Third Order that the Monitor "maintains the independent authority to make the ultimate decision, *but only with respect to the Sheriff*." Or the Monitor "maintains the independent authority to make the ultimate decision, *except the district court has the independent authority*

27

*to make the ultimate decision.*"  If the district court intended to provide for judicial review, it would have done so, like it did in Paragraph 353.

*   *   *

In sum, the district court provided no express mechanism for judicial review of Paragraphs 346, 347, and 350.  The Monitor maintains "the independent authority to make the ultimate decision."

This case shows exactly why courts require an unequivocal mechanism for judicial review.  Not having such an unequivocal mechanism "risks permitting a [nonjudicial officer] to 'displace the district court's role.'"  *Armstrong*, 768 F.3d at 988 (citation omitted).  The Court should vacate Paragraphs 346, 347, and 350.

> **3.    Vacating Paragraphs 346, 347, and 350 is appropriate under this Court's precedent and because even if this Court remanded to the district court for it to add a mechanism for judicial review, it would not save the Third Order.**

The plaintiffs (at 41) and United States (at 26–27) suggest that the Court may solve the problem by remanding to the district court to add judicial review.  Remand without vacatur will not solve the problem.

An example illustrates why.  Suppose the Monitor wants to classify a complaint against an MCSO deputy as a misconduct complaint.  MCSO, however,

28

believes that the complaint is not a misconduct complaint.[3]  MCSO therefore asserts that the misclassification by the Monitor will add to the backlog and only further delay the processing of misconduct investigations.  But again, the Monitor's authority is ultimate and independent; what the Monitor says goes.  1-ER-10, ¶¶ 346, 347.  Under the Third Order, MCSO must comply because it must "expeditiously implement" the decision.  *Id.*  Suppose MCSO then invokes the judicial review provisions the United States envisions the district court could add on remand.  In the meantime, however, the damage is done.  MCSO has expended its misconduct investigation resources on a complaint that never warranted those resources.  After-the-fact judicial review therefore does not solve the problem.

Or consider Paragraph 350, which requires the Monitor to "determine whether training on investigative planning and supervision is needed and implement such training." 1-ER-11, ¶ 350.  If the Monitor wants to implement inappropriate training, MCSO should have an opportunity to seek judicial review.  But because ¶ 350 gives the Monitor authority to implement the training himself, he could implement it before the district court acted.

---

[3] Under the Second Order, MCSO "will conduct objective, comprehensive, and timely administrative investigations of all allegations of employee misconduct." 2-ER-132, ¶ 183.

More fundamentally, the Court should vacate and remand, not merely remand. The United States does not explain why an appellate court should not vacate when the district court failed to provide for judicial review of a nonjudicial officer's actions. The ordinary practice is to vacate, as this Court did in *Armstrong*. *See Armstrong*, 768 F.3d at 988–89 ("We therefore must vacate"); *see also Microsoft*, 147 F.3d at 955 (noting "[it] would have to vacate [the district court's order] subject to possible re-issuance with an unequivocal commitment to non-deferential review"); *cf. Pollinator Stewardship Council v. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015) (in administrative agency context, "We order remand without vacatur only in 'limited circumstances.'").

## II.    The Third Order violates Rule 53.

The plaintiffs and United States do not dispute that a nonjudicial officer appointed under Rule 53 can only make recommendations, which must be subject to district court review. Instead, the plaintiffs (at 42–47) and United States (at 39–41) assert that Rule 53 does not apply to the Monitor because the district court did not expressly appoint the Monitor under Rule 53.

The plaintiffs and the United States, however, do not dispute that (1) courts use the terms "monitor" and "special master" interchangeably, and routinely appoint a "monitor" under Rule 53; (2) when requesting the Monitor, the plaintiffs did not distinguish between special masters and monitors, and cited Rule 53 caselaw as

support for appointing the Monitor; and (3) other than the challenged paragraphs (¶¶ 346, 347, 350), the district court gave the Monitor the roles and responsibilities of a special master. (*See* Opening Br. at 48–51.)

Nevertheless, the plaintiffs assert (at 46) that "Rule 53 cannot be assumed to apply where the district court never invoked the rule." They contend that the district court did not rely on Rule 53 when the court first appointed the Monitor and when the court expanded the Monitor's powers. But as MCSO's opening brief explained (at 50–51), the title given to the nonjudicial officer should not matter; a court should not be able to avoid the limitations of Rule 53 merely by applying another label or applying no label at all.

This has to be the rule. Otherwise district courts could avoid Rule 53's limitations merely by not citing Rule 53. If the law worked like that, then the district courts in cases like *Cobell v. Norton*, 334 F.3d 1128, 1143 (D.C. Cir. 2003), could avoid reversal merely by not specifying the basis for appointing the nonjudicial officer. As *Microsoft* teaches, a special master's findings must "always [be] advisory." 147 F.3d at 955. *Mullen* recognizes that "[m]asters may not be placed in control of governmental defendants for the purpose of forcing them to comply with court orders." *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 545 (9th Cir. 1987) (citation omitted). These principles would be meaningless if a court could avoid them merely by not specifically citing Rule 53.

The plaintiffs and the United States contend that the district court actually appointed the Monitor under the court's inherent equitable power. But the district court did not say that, either. Neither the plaintiffs[4] nor the United States[5] cite any portion of the record in which either the parties or the district court referenced the court's inherent equitable powers in connection with the Monitor.

Compare that to MCSO's opening brief, which cited specific portions of the record in which the plaintiffs relied on Rule 53 cases and used the terms "special master" and "monitor" interchangeably. (Opening Br. at 49.) The plaintiffs and the

---

[4] The plaintiffs (at 44) claim "the district court's separate inherent equitable power . . . is the actual basis for the Third Order's grant to the Monitor of supplemental CPA authority over IA complaint classification and intake procedures." But they do not cite anything from the record, nor do they even cross-reference any specific pages of their brief. In one unrelated spot in their answering brief, the plaintiffs (at 17) cite a sentence in MCSO's filing stating that "The Court's Draft Order implicates both its equitable injunctive power and its inherent power to impose sanctions to enforce compliance with its orders. Both are subject to important limitations." 2-ER-18. This is true. The Third Order implicates the "equitable injunctive power," as MCSO said, because the Third Order contains mandatory injunctions. The Third Order also implicates the "inherent power to impose sanctions" because the Third Order contains a variety of sanctions, including monetary sanctions. MCSO did not contend that the Monitor was appointed under the court's inherent or equitable powers.

[5] The answering brief of the United States asserts "The district court relied on its equitable power, not Rule 53, to appoint the CPA. See pp. 29–36, *supra*." But the cited pages of the brief (29–36) do not cite any part of the record referencing inherent or equitable powers, or otherwise justifying the assertion. Pages 29–31 cite caselaw concerning equitable powers, but cite nothing from the record in this case. Pages 31–36 cite the record in this case, but do not discuss inherent or equitable powers at all.

United States want this Court to assume that the district court relied on its inherent equitable powers but never actually make the case for why that's an appropriate assumption despite the numerous considerations that instead support applying Rule 53.

In arguing that Rule 53 does not apply, the United States (at 40–41) distinguishes between the district court's initial appointment of the Monitor and the expansion of the role in the Third Order. The United States even suggests that this was MCSO's fault because the district court cited MCSO's concern about the delay from bringing another person into the case. (U.S. Answering Br. at 41 (citing 2-ER-90; 1-ER-9).) This misses the point. MCSO does not challenge *who* has this authority; the issue on appeal is that the district court cannot give the powers under Paragraphs 346, 347, and 350 to a nonjudicial officer, and that doing so violates Article III, Rule 53, and Rule 65. As for the Monitor's initial appointment versus the subsequent expansion of authority, MCSO did not object to the Monitor taking on the additional responsibilities (as opposed to someone else), but it took this position on the condition that the Monitor's role was "in line with otherwise how [the expert] has recommended he envisions that role," (e.g., to make recommendations and to not have final authority). 2-ER-56. MCSO has consistently maintained that the district court must "be the ultimate arbiter of what is approved and not approved." 3-ER-306; *see also* 2-ER-278 (monitor's recommendations

should not have "any force or effect unless and until approved and ordered by the Court").

The United States further claims (at 41) that requiring two different people for the role "would essentially discourage courts from pursuing the very efficiencies that MCSO purportedly sought to achieve when it proposed that the Monitor could fulfill two distinct positions." This, too, misses the point. MCSO does not object to who serves in the role. The question is the permissible scope of the role under the Constitution and the Federal Rules of Civil Procedure.

The plaintiffs (at 43–46) and the United States (at 40) cite cases involving receivers for the notion that Rule 53's requirements do not apply. *E.g.*, *F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344, 348 (9th Cir. 1989); *Plata*, 603 F.3d at 1095. But no party contends that the district court appointed the Monitor as a receiver, either functionally or directly. The plaintiffs also cite (at 45) *Jenkins by Agyei v. State of Mo.*, 890 F.2d 65, 66 (8th Cir. 1989), but there the district court's order expressly invoked the court's "inherent power."

The plaintiffs cite (at 44) *Benjamin v. Fraser*, 343 F.3d 35, 47 (2d Cir. 2003), *overruled by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). *Benjamin* recognizes "the sound proposition that, in evaluating the legal status of court-appointed agents, we are guided more by their function than by their title." Here, MCSO explained that in virtually all respects, the Monitor functions as a special master, making

34

recommendations, submitting reports to the district court, etc. (*See* Opening Br. at 50 (collecting record citations).) Under *Benjamin*'s functional test, therefore, the Monitor is a special master and Rule 53 should apply. The only aspects of the Monitor's role that violate Rule 53 are in Paragraphs 346, 347, and 350. Those aspects of his role do not convert his functional role into something else; instead, they simply violate Rule 53.

The plaintiffs (at 43) also cite *Schwimmer v. United States*, 232 F.2d 855 (8th Cir. 1956), but this case illustrates the problem. There, the Eighth Circuit confirmed that "that which the Master has done can only have legal validity through some form of subsequent confirmation or approval on the part of the Court." *Id.* at 865. In other words, the special master cannot act unilaterally without court approval. The district court did not create a procedure for allowing the court to review the master's decisions, so the Eighth Circuit remanded with instructions to modify the order to "permit [the party] to have a ruling from the Court" on the master's decisions. *Id.*

The arguments of the United States and the plaintiffs boil down to one central point of dispute: whether Rule 53 applies. By contending that the rule does not apply, they sweep aside cases like *Microsoft*, *Cobell*, *Armstrong*, and *Mullen*. But the United States and the plaintiffs do not dispute *if Rule 53 applies*, then Paragraphs 346, 347, and 350 violate Rule 53 and the applicable caselaw by giving the Monitor final decision-making authority, which goes beyond the advisory capacity Rule 53

authorizes, and by authorizing the Monitor to implement changes unilaterally without providing for judicial review.

## III. The Third Order violates Rule 65.

MCSO established (at 56–57) that the Third Order violates Rule 65 by improperly vesting the Monitor with authority to tell MCSO what it must do to reduce the backlog of complaints. The plaintiffs and United States do not meaningfully rebut that showing.

To begin, the plaintiffs and United States do not dispute that Rule 65's specificity requirement applies to Paragraphs 346, 347, and 350. They do not dispute that an injunction violates Rule 65 if it gives a nonjudicial officer the authority to dictate what a party must do. They also do not attack the Second Circuit's holding in *Mickalis* announcing this principle.

### A. The plaintiffs and United States ignore the delegation of power issue and focus on provisions that MCSO does not challenge in this appeal.

The plaintiffs (at 50–51) and United States (at 43) assert that *Mickalis* is "distinguishable." *Mickalis* is directly on point.

In *Mickalis*, the district court issued an injunction mandating that the defendant "shall adopt those prophylactic practices that in the opinion of the Special Master will serve to prevent the movement of guns into the illegal market." 645 F.3d at 142. Applying Rule 65(d)'s specificity requirement, the Second Circuit found

36

that the injunction improperly "vest[ed] the Special Master with discretion to determine the terms of the injunctions themselves." *Id.* at 145. The appellate court therefore held that these "sweeping delegations of power to the Special Master violate[d] Rule 65(d)." *Id.*

The United States focuses its analysis (at 42) on how clear Paragraphs 346, 347, and 350 are in delegating the ultimate judicial power to the Monitor. But then the plaintiffs (at 50–51) and United States (at 43) ignore the aspects of *Mickalis* above. They both focus on a separate injunction provision that was also at issue in *Mickalis*—a provision that has nothing to do with improperly delegating power to a nonjudicial officer. That provision "impose[d] on defendants an obligation to act 'in full conformity with the applicable laws pertaining to firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those laws . . . ." *Mickalis*, 645 F.3d at 144. The appellate court found that this provision did not comply with Rule 65(d) because "an injunction must be more specific than a simple command that the defendant obey the law." *Id.*

Relying on this irrelevant part of *Mickalis*, the United States asserts that "in contrast, here, the Third Order simply gives the [Monitor] authority to determine policies and procedures on complaint intake and routing and certain investigative training . . . ." But "simply" giving the Monitor this authority violates Rule 65(d). The issue is not how clear the delegation of power is to the Monitor. The problem

is that by delegating this power, the Third Order does not define what "act or acts [are] restrained or required." Fed. R. Civ. P. 65(d)(1)(C). Instead, it delegates that determination to the Monitor. The United States does not show that Paragraphs 346, 347, and 350 satisfy Rule 65(d).

The plaintiffs' Rule 65(d) analysis also doesn't focus on the relevant issue. The plaintiffs (at 48) argue that the "Second Order deadlines are clear and unmistakable." The plaintiffs then focus (at 50–51) on the immaterial analysis of the other provision in *Mickalis*. They assert (at 50–51) that "the court, far from saying 'obey the law,' has provided clear requirements for the Sheriff: namely, that MCSO must 'decrease the backlog at a reasonable rate,' reduce the backlog by 20 cases a month or pay a fine, and complete IA investigations within '85 calendar days of the initiation of the investigation (60 calendar days if within a Division).'" (Citations omitted.)

But this appeal does not challenge those provisions of the Second and Third Orders. It is clear that MCSO must reduce the backlog or pay a fine. The issue on appeal is the delegation of power to the Monitor, which is in other portions of the Third Order. And other than the assertion (at 50) that the "injunction does not tell 'MCSO that MCSO must do what the Monitor says to do,'" the plaintiffs ignore the power that Paragraphs 346, 347, and 350 give to the Monitor.

In sum, Paragraphs 346, 347, and 350 do not directly tell MCSO what to do, but instead tell MCSO that MCSO must do what the Monitor says to do. Paragraph 346 gives the Monitor the authority to "make determinations and establish policy decisions pertaining to backlog reduction," which MCSO must implement. 1-ER-10, ¶ 346. Paragraph 347 commands that "[t]he Sheriff and the MCSO shall expeditiously implement the Monitor's directions or decision." 1-ER-10, ¶ 347. Paragraph 350 gives the Monitor authority to "implement such training," which will be mandatory for MCSO. 1-ER-11, ¶ 350. By telling MCSO to do what the Monitor says to do, the injunction does not "state its terms specifically," and does not "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C).

### B. *Fortyune* does not apply here.

The plaintiffs (at 49) and United States (at 43) both cite the principle that an injunction need not "elucidate *how* to enforce the injunction" and the district court can leave "logistical matters . . . in the capable hands of the defendants." *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (emphasis in original; internal quotation marks omitted). The plaintiffs then assert (at 49–50) that Paragraphs 346 and 347 "relate only to *how* the Sheriff will be made to comply with the district court deadline."

It is true that the district court can leave how to reduce the backlog to MCSO in the first instance. For example, in the Second Order, the district court ordered MCSO to complete investigations within a certain timeline. 2-ER-137, ¶ 204. But when the district court issued the Third Order setting forth how it wants the backlog reduced, it was no longer leaving how to reduce the backlog to MCSO. It issued a new injunctive order that carries its own risk of contempt, justifying Rule 65(d)'s specificity requirement. *See Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood."). Most aspects of the Third Order pass Rule 65(d)'s requirements. But the portions of Paragraphs 346, 347, and 350 challenged on appeal fail the requirements.

Moreover, the plaintiffs and United States do not dispute that Rule 65(d)'s specificity requirement applies to Paragraphs 346, 347, and 350. Accordingly, *Fortyune* does not apply here.

## IV. The Court should consider MCSO's challenge to Paragraph 350.

The plaintiffs (at 51–53) and United States (at 35 n.8) claim that MCSO waived its challenge to Paragraph 350. As shown in the opening brief (at 24), MCSO asserted in the district court that the Monitor's role should be "in line with otherwise how [the expert] has recommended he envisions that role," (e.g., to make

recommendations and to not have final authority). 2-ER-56. This is the same argument that MCSO now asserts. MCSO has not waived this argument.

Moreover, this Court may exercise its discretion to consider arguments that were not previously raised "when the issue is purely one of law." *Baccei v. United States*, 632 F.3d 1140, 1149 (9th Cir. 2011). The Paragraph 350 challenge involves a purely legal issue. Other than stating the general waiver policy, the plaintiffs (at 52–53) offer no reason why this Court shouldn't exercise its discretion when the issue is "purely one of law." In addition, MCSO's challenge to Paragraph 350 is no different than its challenge to Paragraphs 346 and 347, which no one contends was waived. Invoking the waiver doctrine as to a single paragraph serves no purpose when the same arguments apply to all three paragraphs.

## CONCLUSION

The Court should vacate Paragraphs 346, 347, and 350.

RESPECTFULLY SUBMITTED this 3rd day of November, 2023.

OSBORN MALEDON, P.A.

By s/Eric. M. Fraser
    Eric M. Fraser
    Brandon T. Delgado
    2929 North Central Avenue, Suite 2000
    Phoenix, Arizona 85012

**Attorneys for Defendant/Appellant
Paul Penzone**

## STATEMENT OF RELATED CASES

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form17instructions.pdf

**9th Cir. Case Number(s)** 23-15036

The undersigned attorney or self-represented party states the following:

☒  I am unaware of any related cases currently pending in this court.

☐  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/Eric M. Fraser                    **Date** 11/3/2023
*(use "*s/[typed name]*" to sign electronically-filed documents)*

42

## CERTIFICATE OF COMPLIANCE

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-15036 _____

I am the attorney or self-represented party.

**This brief contains 8,400 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☒ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties;
    ☒ a party or parties are filing a single brief in response to multiple briefs; or
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Eric M. Fraser _____ **Date** 11/3/2023 _____
*(use "s/[typed name]" to sign electronically-filed documents)*